1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  DARREN J. ROBBINS (168593)
   TRICIA L. McCORMICK (199239)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  darrenr@csgrr.com
   triciam@csgrr.com
6       – and –
   EX KANO S. SAMS II (192936)
7  9601 Wilshire Blvd., Suite 510
   Los Angeles, CA  90210
8  Telephone:  310/859-3100
   310/278-2148 (fax)
9  exkanos@csgrr.com

10  Lead Counsel for Plaintiff

11             UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                   WESTERN DIVISION

14
   SCOTT KAIRALLA, Individually and    )  No. CV-07-05569-SJO(PLAx)
15  On Behalf of All Others Similarly   )
   Situated,                           )  CLASS ACTION
16                                      )
                          Plaintiff,    )  CONSOLIDATED COMPLAINT FOR
17                                      )  VIOLATION OF THE FEDERAL
        vs.                             )  SECURITIES LAWS
18                                      )
   ADVANCED MEDICAL OPTICS,             )  DEMAND FOR JURY TRIAL
19  INC., et al.,                       )
                                        )
20                        Defendants.   )
                                        )
21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

1.     These claims arise under, and pursuant to, §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by, and venue is proper pursuant to, §27 of the Exchange Act.  Many of the false and misleading statements were made in, or issued from, this district.  The principal executive offices of Advanced Medical Optics, Inc. ("AMO" or the "Company") are located at 1700 E. St. Andrew Place, Santa Ana, California.  In connection with the acts complained of, defendants used the instrumentalities of interstate commerce and the United States mail.

## NATURE OF THE ACTION

2.     Lead plaintiff NECA-IBEW Pension Fund (The Decatur Plan) ("lead plaintiff") makes the following allegations based upon the investigation of counsel, including, without limitation: a review of SEC filings and regulatory reports concerning AMO; securities analysts' reports and advisories about the Company; press releases and other public statements and information; media, scientific and medical reports and articles; and interviews with former AMO employees.

3.     This is a securities fraud class action on behalf of all persons and entities who purchased or acquired AMO securities between January 4, 2007 and May 25, 2007 (the "Class Period"), against AMO and certain of its officers and directors for violations of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

## SUMMARY OF THE ACTION

4.     AMO develops, manufactures and markets medical devices for the eye. The Company has three product lines: cataract/implant, laser vision correction, and eye care.  The Company's eye care product line provides a range of contact lens care products for use with contact lenses.

5.    As part of its eye care product line, AMO marketed Complete® MoisturePLUS™ Multi-Purpose Solution ("Complete"), a single-bottle, multi-purpose solution for soft contact lenses on a worldwide basis. Multi-purpose solutions refer to solutions that are designed to clean, disinfect and store soft contact lens. Manufacturers began producing multi-purpose solutions in the mid 1980s, replacing more complicated regimens that required consumers to use different agents for cleaning, disinfecting and storing lenses. Manufacturers touted the new solutions as effective in killing dangerous microbes that can cause infection. As reported within a nationally published July 2006 article, however, there was mounting concern in the ophthalmological community that multi-purpose solutions were contributing to dangerous eye infections.  One such dangerous eye infection is *Acanthamoeba* keratitis ("AK").  AK is an often severe, painful infection of the cornea that commonly causes corneal scarring and sometimes blindness.

6.    Numerous factors demonstrate that defendants knew, or were deliberately reckless in not knowing, of the danger posed by Complete and its association in particular with AK. First, in late 2002, AMO added two new chemicals to Complete: hydroxypropyl methylcellulose ("HMPC") and taurine. HMPC, a cellulose derivative, increases the biofilm that normally forms on contact lenses and in lens cases. Taurine is an amino acid-like substance known to convert trophozites, the active form of *Acanthamoeba*, into cysts, the inactive form, which are significantly harder to kill. The addition of HMPC and taurine to Complete exacerbated the biofilm on contact lenses and created a nesting ground for *Acanthamoeba* microbes.

7.    Second, after AMO reformulated Complete in late 2002, the number of cases of AK – which is a relatively rare infection – increased dramatically.  For example, clinicians at the Department of Ophthalmology at the University of Illinois at Chicago diagnosed 40 AK cases between June 1, 2003 and November 30, 2005 – nearly 7 times greater than the number of cases between June 1, 2000 and November 30, 2002. Additionally, in 95% of the cases diagnosed at the university, the patients

- 2 -

1   wore contact lenses.  Similarly, ophthalmologists at the Wills Eye Hospital in

2   Philadelphia reported that they had diagnosed 19 patients with AK between January

3   2004 and August 2005 in contrast to 11 AK cases between 1999 and 2003.  All 19

4   patients were using multi-purpose solutions for lens care.  Thus, AMO's formulation

5   changes for Complete paralleled the onset of AK outbreaks.

6           8.      Third, the introduction of soft silicone hydrogel contact lens in 2000 or

7   2001 presented health issues when used in conjunction with certain multi-purpose

8   solutions such as Complete.  Soft silicone hydrogel lenses, such as Bausch & Lomb's

9   *PureVision* contact lens, interact with multi-purpose solutions by absorbing the

10  disinfectants in certain brands of multi-purpose solutions.  This interaction is more

11  likely to cause corneal staining – the occurrence of a pattern of spots on the surface of

12  the eye that indicates where the cornea has been disrupted.  Staining, which indicates a

13  break in the integrity of the cornea, increases the likelihood of cornel infections.

14  AMO fully understood and recognized this risk: in a July 2006 article discussing a

15  study that found that Complete performed significantly poorly in its ability to prevent

16  corneal staining, particularly with *PureVision* contact lenses, Lynn Lasswell

17  ("Lasswell"), who served as director of eye care clinical research at AMO,

18  "acknowledges that the study is correct, and says the company recommends to doctors

19  that its solution not be used with that particular brand of lens."  Despite this

20  acknowledgment, defendants failed to adequately disclose during the Class Period the

21  impact that such risk would have upon the Company's financial condition.

22          9.      Fourth, numerous studies emerged before and during the Class Period

23  demonstrating that Complete was ineffective in its ability to prevent AK.  One study

24  found that Complete "failed to have any impact" to withstand AK infections.  Another

25  study found that "Complete MoisturePlus was less effective" than other multi-purpose

26  solutions in its disinfection efficacy against AK.  In yet another study issued during

27  the Class Period, researchers concluded that Complete was "relatively ineffective" in

28  its ability to withstand AK and that "Complete was the least effective solution tested."

1  Thus, defendants knew, or were deliberately reckless in not knowing, that Complete
2  was ineffective in its ability to prevent AK.

3       10.   Fifth, Bausch & Lomb's April 2006 recall of its own multi-purpose
4  solution – ReNu with MoistureLoc® – alerted defendants to the risks posed by
5  Complete. Bausch & Lomb recalled ReNu with MoistureLoc® after it was linked to a
6  serious fungal eye infection known as *Fusarium* keratitis. Within a July 26, 2006
7  article, Lasswell, director of eye care clinical research at AMO, referred to Bausch &
8  Lomb's recall by stating that "[i]t was a wake-up call." Lasswell also reported that
9  "[w]e're certainly looking at our testing methods to make them more robust." Thus,
10 after Bausch & Lomb's recall of its multi-purpose solution, defendants were aware of
11 the likelihood that the ineffectiveness of AMO's Complete to withstand AK infections
12 would also result in a recall.

13      11.   Sixth, defendants received, and had access to, consumer complaints made
14 to the United States Food and Drug Administration's ("FDA") Adverse Event
15 Reporting System ("AERS") linking AK to AMO's Complete before and during the
16 Class Period. Through AERS, AMO customers made formal complaints regarding
17 serious eye infections, including AK, that were attributed to Complete. For example,
18 on September 28, 2006, one customer made a report of contracting AK after using
19 Complete and spending 10 days in the hospital fighting the infection. On October 25,
20 2006, another customer logged a report through AERS describing how the customer
21 lost an eye because of contracting AK after using Complete. An October 31, 2006
22 report details another case of AK in which a father described how his son contracted
23 AK after using Complete, required nine months of treatment and developed a scar on
24 his cornea that restricted his vision. Defendants received and/or had access to these
25 and other FDA adverse event reports before and during the Class Period
26 demonstrating the association between Complete and cases of AK. Defendants also
27 received telephone calls from customers complaining of corneal ulcers and burning
28 eyes after using Complete. Despite this information demonstrating the ineffectiveness

1   of Complete to prevent the onset of AK and the drastic increase in AK cases after
2   AMO's reformulation of Complete, however, defendants continued to disseminate
3   false and misleading information to investors and falsely assured investors that any
4   potential concerns related to Complete were under control.

5          12.    In November 2006, the Company announced a voluntary recall of certain
6   lots of Complete, claiming that bacterial contamination compromised sterility.  This
7   announcement caused AMO's stock price to decline.  Throughout the Class Period,
8   defendants made false and misleading statements regarding the Company's financial
9   condition and the problems associated with Complete, assuring the market that the
10  problems were isolated to Asia and that prospects for Complete were favorable.  In
11  late April, the Company announced favorable results, including results that Complete
12  sales had risen 23%.  On this news, the Company's stock price reached a high of $44
13  per share.

14         13.    Then, on May 25, 2007 after the market closed, the Company issued a
15  press release entitled "AMO Announces Voluntary Recall of Complete®
16  MoisturePlus™ Multipurpose Solution."  AMO received data from the Centers for
17  Disease Control and Prevention ("CDC") showing that the CDC had completed
18  interviews with 46 patients who had developed AK since January 2005. A total of 39
19  of these patients were soft contact lens wearers, 21 of whom reported using Complete.
20  The CDC estimated a risk of at least seven times greater for those who used Complete
21  versus those who did not.  After the announcement of the global recall, Chief
22  Executive Officer ("CEO") James V. Mazzo blamed consumers for the problem:
23  "[i]t's not a manufacturing problem or a contamination issue."  Mazzo added that AK
24  "affects people who improperly handle contact lenses, such as disinfecting them with
25  water or wearing them while swimming or showering."

26         14.    The recall of one of AMO's most important products shocked the market.
27  Following the Memorial Day weekend, on May 29, 2007, AMO's stock collapsed
28  $5.51 per share to close at $34.69 per share, a one-day decline of 14% on volume of

1    16.2 million shares. As a result of defendants' false statements, AMO's stock price
2    traded at inflated levels during the Class Period, during which the Company's top
3    officers and directors were able to reap more than $6.8 million in insider trading
4    proceeds.

5        15.    Investigation and research confirmed the extremely strong association
6    between Complete and incidents of AK. Based upon data collected as of June 25,
7    2007, the CDC updated its findings and determined that people with AK who used
8    soft contact lenses were *at least 16 times more likely to have used Complete*
9    compared with a group of healthy adult soft contact lens users. Similarly, in August
10   2007, researchers published a study confirming the strong association between
11   Complete and incidents of AK entitled *The Association of Contact Lens Solution Use*
12   *and Acanthamoeba keratitis*. The study found that "AMO Complete MoisturePlus
13   Multi-Purpose Solution use is independently associated with AK among soft contact
14   lens users." As detailed herein, lead plaintiff and the Class suffered economic loss as
15   a direct result of defendants' fraudulent scheme to artificially inflate AMO's stock
16   price through their false and misleading statements.

17                            **THE PARTIES**

18       16.    Lead plaintiff is comprised of the National Electrical Contractors
19   Association ("NECA") and the International Brotherhood of Electrical Workers
20   ("IBEW"). Established in 1971, lead plaintiff represents electrical workers and
21   includes 13 locals in 4 different states that are administered by the NECA-IBEW
22   Welfare Trust Fund. Lead plaintiff purchased AMO common stock during the Class
23   Period and suffered damages as a result of the violations of securities laws alleged
24   herein.

25       17.    Defendant AMO engages in the development, manufacture and
26   marketing of medical devices for the eye. AMO was incorporated in Delaware in
27   October 2001 as a subsidiary of Allergan, Inc. ("Allergan"). Allergan spun-off AMO
28   to its stockholders by way of a distribution of all of AMO's shares of common stock

on June 29, 2002. AMO's corporate offices are located in Santa Ana, California. During the Class Period, AMO's common stock traded on New York Stock Exchange under the symbol "EYE." Comprised of approximately 4,200 employees worldwide, the Company has 3 product lines: cataract/implant, laser vision correction, and eye care. AMO's eye care product line provides a range of contact lens care products for use with most types of contact lenses. These products include single-bottle, multi-purpose cleaning and disinfecting solutions, hydrogen peroxide-based disinfecting solutions, daily cleaners, enzymatic cleaners and contact lens rewetting drops. The Company marketed its Complete brand single-bottle multi-purpose solution for soft contact lenses on a worldwide basis. Within the eye care market, AMO competed with Alcon, Inc., Bausch & Lomb, CIBA Vision Corporation, and, within the Japan region, Rohto and Menicon.

18.   Defendant James V. Mazzo ("Mazzo") served during the Class Period as Chairman of the Board, President and CEO of the Company. Mazzo exercised a significant degree of day-to-day control over the Company. Mazzo was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein and was aware of, or recklessly disregarded, the false and misleading nature of the Company's statements and information. By reason of his positions, Mazzo had access to material inside information about AMO and was able to, and did, control directly or indirectly the acts of AMO and the contents of the representations disseminated during the Class Period by, or in the name of, AMO. Additionally, the statements made and/or approved by Mazzo as alleged herein are indicative of Mazzo's degree of operational control over AMO, amounting to the power to control the Company's operations. In 2006, Mazzo received a salary totaling approximately $684,865, stock awards amounting to approximately $112,647, option awards of approximately $2,123,838, non-equity incentive plan compensation amounting to approximately $357,500 and other compensation amounting to approximately $163,382, for total compensation of

1   approximately $3,442,232.  Additionally, during the Class Period, Mazzo reaped
2   nearly $3 million in insider trading proceeds by selling 71,430 shares of his AMO
3   stock at artificially inflated prices.

4          19.    Defendant Richard A. Meier ("Meier") served during the Class Period as
5   Chief Financial Officer and Chief Operating Officer of the Company.  Meier
6   exercised a significant degree of day-to-day control over the Company.  Meier was
7   involved in drafting, producing, reviewing and/or disseminating the false and
8   misleading statements and information alleged herein and was aware of, or recklessly
9   disregarded, the false and misleading nature of the Company's statements and
10  information.  By reason of his positions, Meier had access to material inside
11  information about AMO and was able to, and did, control directly or indirectly the
12  acts of AMO and the contents of the representations disseminated during the Class
13  Period, by or in the name of, AMO.  Additionally, the statements made and/or
14  approved by Meier as alleged herein are indicative of Meier's degree of operational
15  control over AMO, amounting to the power to control the Company's operations.  In
16  2006, Meier received a salary totaling approximately $466,173, a bonus of
17  approximately $171,375, stock awards amounting to approximately $44,003, option
18  awards of approximately $912,880 and other compensation amounting to
19  approximately $59,303, for total compensation of approximately $1,653,734.

20         20.    Defendant Holger Heidrich ("Heidrich") served during the Class Period
21  as Corporate Vice President and President, EAM and International Government
22  Affairs of AMO.  Heidrich exercised a significant degree of day-to-day control over
23  the Company.  Heidrich was involved in drafting, producing, reviewing and/or
24  disseminating the false and misleading statements and information alleged herein and
25  was aware of, or recklessly disregarded, the false and misleading nature of the
26  Company's statements and information.  By reason of his positions, Heidrich had
27  access to material inside information about AMO and was able to, and did, control
28  directly or indirectly the acts of AMO and the contents of the representations

1    disseminated during the Class Period by, or in the name of, AMO. Additionally, the
2    statements made and/or approved by Heidrich as alleged herein are indicative of
3    Heidrich's degree of operational control over AMO, amounting to the power to
4    control the Company's operations. In 2006, Heidrich received a salary totaling
5    approximately $448,781, a bonus of approximately $99,000, stock awards amounting
6    to approximately $33,266, option awards of approximately $550,602, change in
7    pension value and non-qualified deferred compensation earnings of approximately
8    $219,563 and other compensation amounting to approximately $45,738 for total
9    compensation of approximately $1,177,379. Additionally, during the Class Period,
10   Heidrich reaped $3.9 million in insider trading proceeds by selling 95,875 shares of
11   his AMO stock at artificially inflated prices, all sold within 3 weeks of AMO's recall
12   announcement.

13        21.    Defendant Aimee S. Weisner ("Weisner") served during the Class Period
14   as Executive Vice President, Administration, General Counsel, Chief Ethics Officer
15   and Secretary of AMO. Weisner exercised a significant degree of day-to-day control
16   over the Company. Weisner was involved in drafting, producing, reviewing and/or
17   disseminating the false and misleading statements and information alleged herein and
18   was aware of, or recklessly disregarded, the false and misleading nature of the
19   Company's statements and information. By reason of her positions, Weisner had
20   access to material inside information about AMO and was able to, and did, control
21   directly or indirectly the acts of AMO and the contents of the representations
22   disseminated during the Class Period by, or in the name of, AMO. Additionally, the
23   statements made and/or approved by Weisner as alleged herein are indicative of
24   Weisner's degree of operational control over AMO, amounting to the power to control
25   the Company's operations.

26        22.    Defendant Leonard R. Borrmann ("Borrmann") served during the Class
27   Period as Executive Vice President, Research and Development. Borrmann exercised
28   a significant degree of day-to-day control over the Company. Borrmann was involved

1   in drafting, producing, reviewing and/or disseminating the false and misleading
2   statements and information alleged herein and was aware of, or recklessly
3   disregarded, the false and misleading nature of the Company's statements and
4   information.   By reason of his position, Borrmann had access to material inside
5   information about AMO and was able to, and did, control directly or indirectly the
6   acts of AMO and the contents of the representations disseminated during the Class
7   Period by, or in the name of, AMO.   Additionally, the statements made and/or
8   approved by Borrmann as alleged herein are indicative of Borrmann's degree of
9   operational control over AMO, amounting to the power to control the Company's
10  operations.

11       23.   Defendants AMO, Mazzo, Meier, Heidrich, Weisner and Borrmann are
12  referred to collectively as "defendants." Defendants Mazzo, Meier, Heidrich, Weisner
13  and Borrmann are referred to collectively as the "Individual Defendants."

14       24.   The defendants are liable, jointly and severally, as direct participants in
15  the scheme and wrongs complained of herein.   Defendants had a duty promptly to
16  disseminate accurate and truthful information with respect to AMO's products,
17  operations, financial condition and future business prospects or to cause and direct
18  that such information be disseminated so that the market prices of AMO's stock
19  would be based on truthful and accurate information.   In addition to the above-
20  described involvement, each defendant had knowledge of AMO's problems and was
21  motivated to conceal such problems.   Defendant Mazzo, as a director, Chairman,
22  President and CEO, was responsible for the financial results and press releases issued
23  by the Company.   Each defendant is liable for (i) making false statements, or (ii)
24  failing to disclose adverse facts known to them about AMO. Defendants' fraudulent
25  scheme and course of business that operated as a fraud or deceit on purchasers of
26  AMO common stock was a success, as it: (i) deceived the investing public regarding
27  AMO's prospects and business; (ii) artificially inflated the price of AMO common
28  stock; (iii) allowed defendants to obtain larger bonuses which were directly tied to the

1   performance of AMO; (iv) allowed certain of the Individual Defendants to sell more

2   than $6.8 million worth of their own AMO shares; and (v) caused lead plaintiff and

3   other members of the Class to purchase AMO securities at inflated prices.

4                    **SUBSTANTIVE ALLEGATIONS**

5   **Confidential Witnesses**

6        25.   The following confidential witnesses ("CWs") have information related

7   to the allegations contained herein.

8        26.   CW1 was a Customer Service Specialist at the Company's corporate

9   facility in Irvine, California. CW1 worked at AMO for more than five months

10  beginning in March 2007. The customer service personnel were split into two teams:

11  a "phaco" team and an eye care team. The "phaco" team was dedicated to handling

12  customer inquiries requiring AMO's refractive surgery equipment. The eye care team

13  handled incoming calls related to billing and contact lens care products. CW1 was

14  assigned to the Northwest United States lens care product customer service team.

15  According to CW1, customer service specialists were assigned to "pods" of two or

16  three team members. Each "pod" was assigned to a specific geographic region in

17  which AMO sold eye care products. The customer service group, however, had a

18  policy whereby customers were not to be left on hold for more than 45 seconds.

19  Accordingly, even if a customer service specialist was assigned to the "Pacific

20  Northwest Pod" as was CW1, calls from a customer in another region might be routed

21  to that specialist if the customer's wait time was approaching the 45-second call hold

22  limit. As a result, CW1 often took calls from customers in New York, Florida and

23  California although CW1 was assigned to the "Pacific Northwest Pod." AMO's

24  customer service specialists received, on average, about 100 calls per day, with each

25  customer service specialist handling between 4 and 5 calls each day. In addition to

26  handling incoming calls from customers, customer service specialists also worked

27  closely with sales representatives to ensure that orders were delivered on time and in

28  accordance with customer requests. Some of AMO's lens care product customers

                                - 11 -

1   included Cedars-Sinai Medical Center, Kaiser Permanente and various optical stores
2   and pharmacies.

3       27.   CW2 was a Research and Development Laboratory Technician at AMO
4   from August 2003 until June 2006. As a laboratory technician, CW2 was assigned to
5   the research and development laboratory at the Company's facility in Santa Ana,
6   California. CW2 worked on the development of "rewetting drops" which were
7   general eye drops developed by AMO. According to CW2, these "rewetting drops"
8   were supposed to work with Complete.

9       28.   CW3 served as an Administrative Assistant to Regulatory Affairs
10  Directors at AMO. CW3 began working at AMO as a temporary employee from
11  November 2005 to February 2006. In February 2006, CW3 became an administrative
12  assistant. As an administrative assistant, CW3 was responsible for, among other
13  things, assisting the regulatory affairs directors with submissions to the FDA.

14      29.   CW4 worked as a Product Specialist and Associate Sales Analyst at
15  AMO for a total of approximately nine years, departing from the Company in late
16  2006. As a Product Specialist, CW4 was responsible for handling incoming calls
17  related to AMO's products, including Complete.

18  *Acanthamoeba* **keratitis**

19      30.   AK is an often severe, painful infection of the cornea that commonly
20  causes corneal scarring and sometimes blindness. *Acanthamoeba* are ubiquitous
21  protozoa (one-celled animals) that exist in two forms: trophozoites (the active form)
22  and cysts (the inactive form). Under unfavorable conditions, trophozoites transform
23  into cysts that are resistant to extremes of temperature, pH and lack of water. Cysts
24  are notoriously difficult to kill, a factor that renders AK difficult to eradicate. AK,
25  moreover, is difficult to treat, requiring intensive therapy and frequently a corneal
26  transplant.

27      31.   Occurrences of AK are rare. Researchers first recognized AK in 1973
28  and the first published report of confirmed AK was in 1974. Throughout the next

1   decade, instances of AK were extremely uncommon.  In 1985, however, an AK
2   outbreak prompted an investigation by the CDC.  The investigation revealed that
3   contact lens use was a primary cause of the AK outbreak.  Indeed, of the 208 cases of
4   AK between 1973 and 1988, more than 85% involved contact lens wearers,
5   demonstrating that contact lens use was, and is, a significant risk factor for AK.
6   Currently, approximately 36 million people in the Unites States use contact lenses.

7   **The Advent of Soft Silicone Hydrogel Contact Lenses**

8       32.   The chemical properties of the latest generation of contact lenses, known
9   as soft silicone hydrogel lenses, make them more prone to absorbing the disinfectants
10  in multi-purpose solutions such as Complete.  Contact lens manufacturers began
11  making lenses from silicone hydrogel material because of the smooth feel of the
12  material and its oxygen permeability.   Such lenses also potentially reduce the
13  occurrence of hypoxia – the shortage of oxygen in the cornea that can occur with the
14  use of standard hydrogel lenses.  Soft silicone hydrogel lenses have a higher "Dk" – or
15  oxygen permeability rating – than standard hydrogel lenses, which is sometimes as
16  much as three or four times the Dk rating of standard silicone hydrogel lenses.

17      33.   Although contact lens manufacturers introduced hard silicone hydrogel
18  lenses decades ago, the advent of soft silicone hydrogel lenses is relatively recent.
19  Manufacturers introduced soft silicone hydrogel lenses in approximately 2000 or
20  2001. Initially, Bausch & Lomb and CIBA Vision competed over the right to launch
21  and market the first soft silicone hydrogel lenses. CIBA Vision developed the *Focus*
22  *Night & Day* soft silicone hydrogel contact lens and Bausch & Lomb developed the
23  *PureVision* contact lens.

24      34.   The introduction of soft silicone hydrogel lenses presented, and presents,
25  certain health issues for contact lens wearers. One challenge is that the silicone in the
26  lens material repels water, including tears.  This issue of water repulsion is more
27  significant because soft silicone hydrogel lenses are often stiffer than standard
28  hydrogel lenses and can sometimes rub on the eye, causing irritation and damage.

1    Another issue that emerged with the introduction of soft silicone hydrogel lenses was

2    their novelty.  Indeed, these new lenses did not fit into the four existing classifications

3    for contact lenses developed by the FDA: (1) high water ionic; (2) high water non-

4    ionic; (3) low water ionic; and (4) low water non-ionic.

5        35.    The advent of soft silicone hydrogel lenses also presented issues for

6    manufacturers of contact lens solutions because the new lens material was sometimes

7    incompatible with existing solutions.  Soft silicone hydrogel lenses interact with

8    multi-purpose solutions by absorbing the disinfectants in certain brands of multi-

9    purpose solutions.  This interaction is more likely to cause corneal staining – the

10   occurrence of a pattern of spots on the surface of the eye that indicates where the

11   cornea has been disrupted.  Staining, which indicates a break in the integrity of the

12   cornea, increases the likelihood of corneal infections.

13       36.    Optometrist Gary Andrasko of Columbus, Ohio, conducted a study to

14   address corneal staining by comparing seven multi-purpose solutions with five

15   different types of lenses.  After conducting 5,000 separate tests on more than 400

16   contact lens wearers, Dr. Andrasko found AMO's solution to be particularly poor; it

17   produced higher levels of staining, especially when used with Bausch & Lomb's

18   *PureVision* contact lenses.  In a July 2006 article, Lasswell, director of eye care

19   clinical research at AMO, "acknowledges that the study is correct, and says the

20   company recommends to doctors that its solution not be used with that particular

21   brand of lens."  Although AMO acknowledged that Complete posed a health risk

22   when used with soft silicone hydrogel contact lenses such as *PureVision*, defendants

23   failed to adequately disclose during the Class Period the impact that such risks would

24   have for consumers and upon the Company's financial condition.

25   **AMO's Reformulation of Complete**

26       37.    AMO's contact solution products, especially Complete, were extremely

27   important to the Company's business.    Multi-purpose solutions represented

28   approximately 14.8%, 17% and 21% of AMO's net sales in 2006, 2005 and 2004,

- 14 -

respectively.   Complete, moreover, contributed $105.7 million to AMO's sales in 2006 and was responsible for 10% of the Company's annual sales.

38.   In late 2002, AMO reformulated Complete.   Before a company can market a new medical device in the United States or modify the use of an existing product, the company may have to apply for and receive either 501(k) clearance or premarket approval. This process relates to §510(k) of the Food, Drug and Cosmetic Act, which requires device manufactures to notify the FDA of their intent to market a medical device. This process is known as premarket notification – also called PMN or 510(k). According to CW3, Regulatory Affairs Directors Javid Bashir ("Bashir") and Pam Schab ("Schab") handled 510(k) submissions to the FDA.   Schab served as Director of Regulatory Affairs for AMO's eye care products operations, and both Bashir and Schab reported to Vice President of Regulatory Affairs Nick Tarantino ("Tarantino"), who, in turn, reported to Senior Vice President Jane Brady ("Brady"). Additionally, according to CW3, Bashir and Schab prepared weekly and monthly reports detailing specific matters pertaining to AMO products, such as 501(k) approvals or FDA inquiries regarding particular product support or testing documentation. According to CW3, AMO's regulatory affairs staff included Toni Elliot, Janice Filippelli, Jeanne Isaacs, Van Nguyen, Shawn Pendley, Dale Osaki, Lasswell, Rohit Patel, Kim Regis, Debbie Trentacost, Barbara Simon and Peter Xu. Schab conducted weekly meetings for the regulatory staff members and both Schab and Bashir attended a weekly directors meeting led by Tarantino. According to CW3, Schab and Bashir were responsible for preparing and submitting weekly and monthly reports to Tarantino.   These reports, according to CW3, contained action items specified in staff and directors meetings and information related to the current events in the department.

39.   On or about December 16, 2002, AMO submitted a 510(k) summary for Complete. In the formula for Complete, AMO included a disinfectant that was less effective against AK than those used in other multi-purpose solutions.   AMO also

- 15 -

added taurine, an amino acid-like substance known to convert trophozoites, the active form of *Acanthamoeba*, into cysts, the inactive form, which are significantly harder to kill. In essence, the addition of taurine caused the *Acanthamoeba* protozoa to form a shell around themselves, rendering the microbes much more difficult to eradicate. In its reformulation of Complete, AMO also added HPMC, a cellulose derivative. In a November 2003 survey, Lasswell – who at the time served as the Manager of Clinical Research for Eye Care (Contact Lens) and Refractive Surgery Products at AMO – indicated that, at that time, Complete was the "only such solution that contains [HPMC]."

40.     The addition of these chemicals in Complete exacerbated the biofilm that forms on contact lenses. The biofilm represents layers of biological material, including old corneal cells that flake off and dry up on lenses and in lens cases. The addition of HPMC in Complete increased the amount of biofilm exponentially. Indeed, in microscopic pictures of the HMPC-associated biofilm, the biofilm resembles a bowl of spaghetti – a virtual nest for *Acanthamoeba* protozoa. Additionally, HPMC, like any cellulose derivative, contains vegetable extracts, which then feed the trapped or nested *Acanthamoeba* protozoa, leading to an overgrowth of the microbes.

**The Dramatic Increase in Incidents of *Acanthamoeba* keratitis**

41.     After AMO reformulated Complete in late 2002, the number of AK cases increased significantly. For instance, clinicians at the Department of Ophthalmology at the University of Illinois at Chicago diagnosed 40 AK cases between June 1, 2003 and November 30, 2005. Of these 40 cases, 38 of them – or 95% – involved patients who wore contact lenses. In fact, the relative risk for AK diagnosis between June 1, 2003 and November 30, 2005 was nearly seven times greater than between June 1, 2000 and November 30, 2002.

42.     Similarly, ophthalmologists at the Wills Eye Hospital in Philadelphia, Pennsylvania spoke at the annual meeting of the American Academy of

- 16 -

1   Ophthalmology in October 2005. The ophthalmologists reported that they had
2   diagnosed 19 patients with AK between January 2004 and August 2005 in contrast to
3   11 AK cases at the Wills Eye Hospital between 1999 and 2003. All 19 patients were
4   using multi-purpose solutions for lens care. AMO representatives attended the
5   conference and had booths and/or exhibits at the conference.

6      43.   Additionally, physicians at the Massachusetts Eye and Ear Infirmary
7   ("MEEI") announced that MEEI performed four therapeutic transplants for
8   recalcitrant AK in 2006. In previous years, physicians at MEEI only diagnosed one or
9   two cases of AK. Thus, AMO's formulation changes for Complete in late 2002
10  paralleled the onset of AK outbreaks.

11  **Studies Demonstrating the Ineffectiveness of Complete**

12     44.   Coupled with outbreaks of AK after AMO's formulation changes for
13  Complete, numerous studies emerged demonstrating the ineffectiveness of Complete
14  to withstand AK infections. For instance, in July 2003, Tara K. Beattie, David V.
15  Seal, Alan Tomlinson and others published an article entitled *Determination of*
16  *Amoebicidal Activities of Multipurpose Contact Lens Solutions by Using a Most*
17  *Probable Number Enumeration Technique*. The study tested six multi-purpose
18  contact lens solutions – including Complete – for their efficacies against
19  *Acanthamoeba castellanii* trophozoites and cysts. The study concluded that Complete
20  "*failed to have any impact*" after AMO's minimum recommended disinfection time
21  on the trophozoites and cysts.

22     45.   Similarly, in 2005, R.N. Borazjani and S. Kilvington published an article
23  entitled *Efficacy of Multipurpose Solutions Against Acanthamoeba Species*. The
24  purpose of the study was to test the disinfection efficacy of contact lens multi-purpose
25  solutions against strains of *Acanthamoeba*. The researchers concluded that "[w]hile
26  all of the MPSs [multi-purpose solutions] were effective at reducing the number of
27  viable *Acanthamoeba* species on groups I and IV conventional hydrogel lenses,

28

- 17 -

1    *Complete MoisturePlus was less effective than the others*, with viable organisms in

2    excess of 10 recovered from both SofLens 38 and Surevue hydrogel lenses."

3        46.    In March 2007, Megan Shoff, Andrew Rogerson and others published an

4    article entitled *Variable Responses of Acanthamoeba Strains to Three Multipurpose*

5    *Lens Cleaning Solutions*. The purpose of the study was to compare *Acanthamoeba*

6    strain differences by testing their susceptibility to various multi-purpose contact lens

7    cleaning solutions. Complete was one of the tested solutions. The study

8    demonstrated that Complete was "*relatively ineffective*" and that "*Complete was the*

9    *least effective solution tested*." Defendants were aware of and/or had access to these

10    studies demonstrating the ineffectiveness of Complete.

**Bausch & Lomb's Recall of ReNu with MoistureLoc®**

12        47.    On April 13, 2006, Bausch & Lomb issued a global recall of its multi-

13    purpose contact solution – ReNu with MoistureLoc® – after it was linked to serious

14    fungal eye infections in the United States and Asia known as *Fusarium* keratitis.

15    Importantly, Complete contained HPMC, which, like the surfactant that came under

16    suspicion in Bausch & Lomb's ReNu with MoistureLoc® solution, can create a

17    residue that sustains opportunistic infections.

18        48.    In an article entitled "Bausch & Lomb Recall Exposes Eye Infection

19    Risks" that appeared in the July 26, 2006 issue of the *Wall Street Journal*, AMO

20    recognized the effect of Bausch & Lomb's recall on AMO's multi-purpose solution

21    Complete:

22        Marketers are taking action, too. "*It was a wake-up call*," says Lynn

23        Lasswell, director of eye care clinical research at Advanced Medical

24        Optics Inc., maker of multipurpose solution brands including Complete

25        MoisturePLUS. "*We're certainly looking at our testing methods to*

26        *make them more robust*."

27        49.    Indeed, after Bausch & Lomb's recall, defendants internally were very

28    concerned about whether AMO would experience a similar recall for Complete.

1   According to CW2, Senior Vice President Brady exuded a sense of nervousness after

2   Bausch & Lomb recalled ReNu with MoistureLoc®. CW2 believes that Brady was

3   nervous at the time because AMO could face with Complete the same type of recall

4   that Bausch & Lomb experienced with ReNu with MoistureLoc®.

5       50.   Similarly, according to CW3, CEO Mazzo expressed concern after

6   Bausch & Lomb's recall during an AMO meeting about the likelihood of a recall

7   concerning Complete. AMO held quarterly review "all persons" meetings at the

8   Company's corporate facility in Santa Ana, California. According to CW3, during

9   one of AMO's "all persons" meetings in May or early June of 2006, Mazzo discussed

10  Bausch & Lomb's recall of ReNu with MoistureLoc®. Mazzo, according to CW3,

11  told participants during the meeting that Bausch & Lomb was a much larger company

12  than AMO and that if AMO faced a similar recall related to Complete, the impact

13  would be much more substantial to the Company. Additionally, according to CW3,

14  during one of Schab's regulatory affairs meetings in May or June of 2006, the

15  participants discussed the development of a replacement product for Complete, one

16  that would substitute a then-existing ingredient with a replacement ingredient. Others

17  in the Company similarly were concerned about the likelihood of a recall involving

18  Complete. In fact, CW4 had conversations with Planning Specialist Patti Overley

19  ("Overley") and Quality Assurance team member Avery Funk ("Funk") in which

20  Overley and Funk indicated that they both were not surprised by AMO's May 2007

21  recall of Complete.

22      51.   The July 26, 2006 *Wall Street Journal* article also indicated that after the

23  Bausch & Lomb recall, AMO sought to reassure customers that Complete was safe:

24  "For example, AMO's Web site features a banner titled 'important message regarding

25  safety of multi-purpose solutions' which takes users to a company letter touting its

26  solution's 'excellent safety record.'" The article also stated that AMO "is thinking of

27  adding testing organisms that are currently not required by the FDA" in response to

28  the *Fusarium* keratitis outbreak that led to the Bausch & Lomb recall. Additionally,

1  Kristen Neese, a spokesperson for the FDA, stated after the Bausch & Lomb recall
2  that the International Organization for Standardization – whose testing guidelines the
3  FDA imposes on manufacturers of contact lens solutions – was in the midst of
4  revising the standards for disinfecting efficacy.

5  **The FDA's Adverse Event Reporting System**

6      52.   The FDA's AERS reporting system is a computerized information
7  database designed to support the FDA's post-marketing safety surveillance program
8  for all approved drug and therapeutic biological products. The ultimate goal of AERS
9  is to improve the public health by providing the best available tools for storing and
10  analyzing safety reports.

11      53.   The FDA receives adverse drug reaction reports from manufacturers as
12  required by regulation.  Health care professionals and consumers send reports
13  voluntarily through the MedWatch program.  These reports become part of a database.
14  The FDA codes all reported adverse events using a standardized international
15  terminology, MedDRA (the Medical Dictionary for Regulatory Activities).  Among
16  AERS system features are: the on-screen review of reports; searching tools; and
17  various output reports.  The FDA staff use reports from AERS in conducting
18  postmarketing drug surveillance and compliance activities and in responding to
19  outside requests for information.  The reports in AERS are evaluated by clinical
20  reviewers in the Center for Drug Evaluation and Research and the Center for
21  Biologics Evaluation and Research to detect safety signals and to monitor drug safety.
22  They form the basis for further epidemiological studies when appropriate. As a result,
23  the FDA may take regulatory actions to improve product safety and protect the public
24  health, such as updating a product's labeling information, sending out a "Dear Health
25  Care Professional" letter, or re-evaluating an approval decision.

26      54.   Before and during the Class Period, defendants received and/or had
27  access to adverse event reports demonstrating the association between Complete and
28  the onset of AK.  The following are examples of such adverse event reports:

- (Report dated September 28, 2006); The subject acquired a fungal and/or acanthamoeba eye infection using complete moisture plus multi-purpose solution by amo. We are into the 5th week of fighting this infection, she was being treated at hosp, and then treatment was relocated to eye institute on the fourth day of the infection as the infection was still not yet under control and these doctors are more experienced in treating the fungal and acanthamoeba eye infections. She's been in and out of hospitals 10 of the last 32 days receiving many antibacterial, antifungal and antiamoebic eye drops – atropine, zymar, natacyn, neomycin, brolene, phmb, pred forte.

- (Report dated October 25, 2006); I used amo complete contract lens solution and johnson acuvue 2 contact lenses and contracted acanthamoeba keratitis in november 2005. In spite of medications and four surgeries in five weeks, I lost my eye due to the disease. I strongly believe the solution is ineffective because 8 out of 17 or 59% of acanthanmoeba victims that I know of in our maad group – see prevent blindness america's web forum – have used complete solution. That is more than a coincidence. It is alarming. I have worn contact lenses – hard, gas permeable, toric and soft –for 48 years. No doctor, lens dispenser, or solution manufacturer has ever warned me about water related risks. In fact, with hard lenses one would not put solution on them and rinse them with water, so why would I think water was harmful? I did not wear them swimming, I never go in hot tubes, and I didn't sleep in them. I did shower with them in twice with my eyes closed, because no one ever told me not to.

- (Report dated October 31, 2006); My son was a contact lens wearer who developed acanthamoeba eye infection. He had worn contacts for 4 yrs with no adverse reactions. June 2006, he developed

- 21 -

1          eye infection.    It took 6 physicians and sometimes daily doctor
2          appointments to diagnose acanthamoeba keratitis. He required 9 months
3          of treatment and has a scar on his cornea which restricts his vision. At
4          the time of the infection he was using complete contact lens solution
5          made by amo and accuvue ii contacts.

6         55.    Defendants and other AMO representatives, such as Sharon Chase-Jones
7    ("Chase-Jones"), (AMO's Medical Specialist Supervisor who worked in AMO's
8    complaint handling group) received and/or had access to these and other FDA adverse
9    event reports demonstrating the association between Complete and AK before and
10    during the Class Period.  Chase-Jones reported to Funk, who served as AMO's
11    complaint handling manager and an AMO Quality Assurance team member.  For
12    many FDA adverse event reports, AMO submitted a manufacturer narrative section to
13    the FDA related to the reports, demonstrating that the Company received the
14    information contained within the reports. Vice President of Worldwide Quality Sandy
15    Selvaggi and Vice President of Regulatory Affairs Tarantino were among the AMO
16    representatives who dealt with the FDA adverse event reports and CEO Mazzo likely
17    received the reports as well, among others.

18         56.    Defendants and other AMO representatives also received telephone calls
19    from customers who experienced eye injuries after using Complete.  According to
20    CW4, there was a toll-free number on the product packaging for Complete that
21    customers could call when they had questions or concerns about the product.  CW4
22    received calls from customers after the 2003 launch of Complete who complained
23    about corneal ulcers and burning eyes after using Complete. According to CW4, any
24    call that AMO received from customers that was medical in nature was re-directed to
25    Medical Specialist Supervisor Chase-Jones.

26         57.    Defendants sought to convince the market that the problems associated
27    with Complete were isolated to Asia, being corrected and would not be a long-term
28

1    problem for the Company.  In fact, in the conference call following the November
2    2006 recall announcement, CEO Mazzo termed the recall "overbroad," and stated:

3          But we have gone, again, overbroad.  We have used four external
4          consultants to help guide us through this, everyone from a regulatory
5          expert to a communication expert, to an FDA expert, to a recall expert, to
6          ensure that we manage this situation at the highest levels.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

8          58.    On January 4, 2007, defendant Borrmann appeared at the Morgan Stanley
9    Pharmaceutical "CEOs Unplugged" conference to discuss the Company's business
10   and prospects.  When asked about issues related to the Company's November 2006
11   recall, Borrmann stated:

12         [BORRMANN:]   *Actually, we're making outstanding progress*
13   *on that.*  As a follow-up to the recall that we went through in the later
14   part of last year on selected lots of our Complete Moisture PLUS product
15   that were attributed to a couple of manufacturing lines in our China
16   facility.  We went through a comprehensive cleaning and sterilization
17   process in conjunction with a planned expansion of our China facility.
18   We are on track to bring three out of the four of our China manufacturing
19   lines up in February with the final one coming up in May.

20         It will also provide us with some increased capabilities in terms of
21   packaging and also in terms of small-volume fill size, which is going to
22   be critical to the manufacturing of our dry eye products scheduled to
23   launch later this year.

24         *So we are really happy with the progress, and everything is right*
25   *on track.  I also want to point out that this challenge that we have had,*
26   *has been limited exclusively to our China facility.*  Our Spanish facility
27   has remained up and running through this entire process and continues to

1  serve all of our eyecare product requirements for both Europe and for the

2  United States.[1]

3      59.    On February 13, 2007, AMO issued a press release entitled "Advanced

4  Medical Optics Announces Fourth-Quarter and Full-Year 2006 Results." The press

5  release stated in part:

6          —    2006 Net Sales Rise 8.3% to $997.5 Million; 2006 GAAP

7               EPS of $1.21

8                          *        *        *

9          —    2006 Eye Care Sales Decline 13.1% Due to Rationalization

10              and Recall

11         —    Company Reiterates 2007, 2008 Revenue and Adjusted

12              EPS Guidance

13         —    Company Begins 2007 with Announcements of Strategic

14              Acquisitions of IntraLase and WaveFront Sciences

15  Advanced Medical Optics, Inc. (AMO), a global leader in ophthalmic

16  surgical devices and eye care products, today announced financial results

17  for the fourth quarter and full year 2006.

18      AMO 2006 net sales rose 8.3 percent to $997.5 million. The rise

19  reflects the May 2005 acquisition of VISX, Incorporated and subsequent

20  international expansion of the company's laser vision correction (LVC)

21  business, as well as increased demand for the company's premium

22  intraocular lenses (IOLs) and proprietary phacoemulsification systems.

23  Net sales growth in 2006 was partially offset by a loss of sales following

24  the company's November 2006 eye care recall, a reduction in net sales

25

26  _____

27  [1]    The statements that lead plaintiff alleges are false and misleading are identified
    throughout this Consolidated Complaint in bold and italicized text.

28

related to the company's business rationalization efforts and a 0.2 percent decline related to foreign currency.

For 2006, AMO reported income under Generally Accepted Accounting Principles (GAAP) of $79.5 million, or $1.21 per diluted share, including the impact of the recall. . . .

                            *      *      *

"In 2006, we made progress toward our strategy to establish AMO as the refractive company," said Jim Mazzo, AMO chairman, president and chief executive officer. "We grew our monofocal IOL, refractive IOL and phacoemulsification businesses. We expanded our LVC business and began to establish a procedure-based model overseas, while moving to strengthen our global LVC technology leadership with strategic acquisitions. *We successfully repositioned our eye care business by streamlining our offering to focus on higher-margin products, while aggressively addressing the recall at the end of the year.* In addition, we prepared to introduce a series of new products across each of our businesses in 2007."

Fourth-Quarter Results

Fourth-quarter 2006 net sales of $243.6 million represented a 3.6 percent decline compared to the same quarter last year. The fourth-quarter net loss of $7.6 million, or a loss of $0.13 per share, was due primarily to recall-related sales declines, product returns and costs, and the tax effect of these issues. Final repositioning costs and the unrealized loss on derivative instruments increased the per share loss by $0.03. This performance compares to net income of $2.3 million, or $0.03 per share, in the same period last year. The fourth-quarter 2005 results were reduced by $0.37 due to the combined effect of after-tax charges of $25.8 million primarily related to rationalization and

repositioning actions, as well as a tax benefit of $5.7 million for repatriation of foreign earnings and an unrealized gain on derivative instruments.

*   *   *

Eye Care Overview

After successfully rationalizing and repositioning the eye care business, expanding market share and preparing to launch two new products in 2007, further progress was delayed by the recall late in 2006.

*Last November, the company commenced a recall of approximately 2.9 million units of its eye care products from the Asia Pacific, Japan and U.S. markets due to a production-line issue at its China manufacturing facility. To resolve the recall, the company also announced a 10-12 week plant closure to clean and sanitize the facility and conduct an already-planned expansion, which is now nearing completion.* Production has resumed on two of the four manufacturing lines and the company expects to begin shipping to its distribution centers in Japan this week. The third line is expected to commence operation this month, with shipping to Asia Pacific planned to commence prior to the end of the first quarter of 2007. The fourth line, which provides enhanced packaging capabilities, is expected to resume production in the second quarter of 2007, consistent with the original timeline. Production for the U.S. and European markets was uninterrupted during the recall as these markets are supplied by the company's facility in Spain, which was not affected by the production-line issue.

As a result of the recall, the company estimated an impact to fourth-quarter and 2006 eye care sales of approximately $25 million, which was slightly higher than originally estimated due to higher returns.

The $25 million impact included approximately $10 million in returns and an estimate of $15 million in lost sales. The company anticipates that it will lose an additional $20 million to $25 million in sales in 2007. In addition, the company incurred approximately $15 million in costs associated with the recall, which were recognized in cost of goods sold and SG&A expense in the fourth quarter and full year. The company anticipates that it will incur an additional $20 million to $25 million in recall-related costs in 2007.

For 2006, eye care sales declined 13.1 percent versus 2005 to $261.6 million, reflecting the impact of the recall, declines in hydrogen peroxide solution sales and lost sales associated with planned product rationalizations. These same factors caused fourth-quarter eye care sales to decline 20.2 percent to $53.0 million versus the same period last year. The impact of foreign currency caused a 0.5 percent decline for the year and a 2.8 percent increase for the fourth quarter. Below are eye care sales highlights. Growth rates reflect comparisons to the same period in 2005 and include the impacts of foreign currency.

– Multipurpose solution sales declined 4.7 percent to $147.2 million as growth in the first nine months of the year was offset by the recall. Fourth-quarter multipurpose solutions sales declined 26.4 percent.

– *U.S. sales of COMPLETE® MoisturePlus™ rose 48.1 percent for the year and 25.7 percent in the fourth quarter. According to IRI, an independent market research firm, COMPLETE® MoisturePlus™ dollar share of the U.S. branded multipurpose solution market was 12.8 percent for the four weeks ended January 28,*

*2007, representing an approximate 11 percent increase since the beginning of 2006.*

–  Sales of hydrogen peroxide solutions declined 19.4 percent to $62.3 million. Fourth-quarter hydrogen peroxide solution sales declined 23.6 percent to $13.9 million. The declines reflect this market's contraction in Japan and Europe, and the impact of the planned product rationalization.

–  Sales of other eye care products declined 24.7 percent to $52.1 million in 2006. Fourth-quarter sales for this category declined 3.2 percent to $15.2 million. The declines reflect the planned rationalization of older-generation products.

60.  Subsequent to issuing its results, AMO hosted a conference call for analysts, media representatives and investors on February 13, 2007, during which defendants represented the following:

[MAZZO:] We continued to build a pipeline of new innovations that will allow each AMO business to launch at least one new major product in '07. *We also managed through some difficult challenges including the November voluntary eye recall due to a production line issue at our China facility. We acted swiftly and responsibly to remove affected product, communicate with customers, keep regulatory bodies informed, and take appropriate corrective actions. Feedback from practitioners, retailers and consumers regarding out handling of the situation has been positive, and I believe we've done everything possible to minimize the recall's impact including sticking to our original timeline to bring the plant back online and begin re-supplying*

- 28 -

1    *the affected markets in the first quarter of '07.*  Randy will talk more

2    about this in his update of the eyecare business.

3                              *       *       *

4        [MEIER:]   *From a regulatory perspective, we continue to be on*

5    *track as well.*  Throughout the recall process, AMO has maintained

6    excellent relations with all regulatory bodies around the world.  *To date*

7    *we have closed the recall initiatives with a number of these regulatory*

8    *groups in the Asia-Pacific region.  We expect to close the issue with*

9    *both the China and Japanese agencies over the next three or four*

10   *weeks, and are targeting the end of March, early April, to conclude our*

11   *recall activities with the FDA.*

12       From an inspection point of view, the China officials have been

13   through the facilities and given approvals. As of today, the FDA has not

14   requested an inspection.  We have worked with various consultants to

15   validate and test our processes and procedures and we believe we are

16   well prepared for any future plant inspections.

17       61.   Defendants' statements about the Chinese facility were important to

18   analysts. Prudential Equity Group, LLC noted in its February 13, 2007 report:

19       The ramp up of the lens care solutions factory in China is ahead of

20   schedule. EYE is nearing the completion of the plant cleaning and has

21   resume production on 2 of the 4 manufacturing lines.  EYE expects to

22   begin shipments to Japan this week, which is ahead of our expectation.

23   EYE also plans to have the 3rd line operational this month and begin

24   shipments to Asia/Pacific in March, which is in line with its previous

25   schedule. The 4th line is expected to resume operations in 2Q07, which

26   is also consistent with prior expectations.  We view this update as a

27   significant positive for EYE, given that by our calculations (assuming

28   G&A costs are sunk) we estimate that for every additional month the

                                  - 29 -

1    factory does not ship product, EYE will forgo about $4M in sales, worth
2    about $0.04 to EPS.  In 2007, EYE expects to lose $20-25M in sales and
3    record $20-25M in additional costs associated with the recall.  The costs
4    will be evenly split between 1Q and 2Q, with some charges possibly
5    running into 3Q.

6         62.    On February 27, 2007, AMO participated in a conference call for
7    analysts, media representatives and investors during which defendants represented the
8    following:

9         [MAZZO:]  *Now, moving to our eye care arena, obviously we had a*
10        *little bit of an impact in the fourth quarter with our recall out for – out*
11        *of our China facility for one of our product lines.*  And that overall
12        impacted our largest growth item here, the multipurpose solution.  *The*
13        *recall predominantly impacted Asia-Pacific and Japan.  Our Spanish*
14        *facility, which meets all of our European needs as well as our U.S.*
15        *needs were not impacted from that end.  It was not a formula issue; it*
16        *was a product line, one of the manufacturing lines that forced us to*
17        *close down our China facility.*

18                          *       *       *

19        [MAZZO:]  *Well, again, this is not a formula issue.*  A micro organism
20        got into one of our lines, we completely have shut down the facility, we
21        have fumigated the facility.  We've put in all new lines, state-of-the-art
22        type to ensure that things like this don't happen again.  I think the best
23        way to do it is you completely revamp the manufacturing line, upgrade
24        them to the highest type of equipment that you can acquire and that's
25        what we've done.  Because, again, we've had no issues in our
26        Alcobendas facility, which makes Europe and the U.S.  All the testing
27        has been on an ongoing basis.  Unfortunately, we had one of these lines.
28        We were a little more aggressive.  We didn't need to do some of the

1    actions we did, but we felt that it was prudent to do that. And so, that's

2    why we completely shut down the whole facility. It was really only one

3    of the lines that was mainly impacted, but we closed the whole facility.

4        63.    On March 1, 2007, AMO filed its 2006 Form 10-K, which contained the

5   results previously reported and also stated the following about potential product

6   recalls, but failed to disclose increasing problems associated with Complete and AK:

7        The FDA and similar governmental authorities in the other countries

8        have the authority to require the recall of our products in the event of

9        material deficiencies or defects in design or manufacturing.    A

10       government mandated or voluntary recall by us could occur as a result of

11       manufacturing errors or design defects, including defects in labeling.

12       We have undertaken voluntary recalls of our products in the past.

13       64.    On April 25, 2007, the Company issued a press release entitled

14  "Advanced Medical Optics Announces First-Quarter 2007 Results – GAAP EPS of

15  $0.20 Includes Approximately $0.03 in Non-Cash Acquisition-Related Charges – Net

16  Sales Rise 5.6% to $251.7 Million on Growth in Company's Three Business Units –

17  IOL Sales Up 13.6% to $75.9 Million on Tecnis® Monofocal IOL and Refractive

18  Implant Growth – Laser Vision Correction Procedure Sales Climb 12.4% to $45.6

19  Million – Eye Care Sales Rise 4.4% to $59.3 Million As Product Shipments Resume."

20  The press release stated in part:

21       Advanced Medical Optics, Inc. (AMO), a global leader in ophthalmic

22       surgical devices and eye care products, today announced financial results

23       for the first quarter of 2007.

24           The company's net sales rose 5.6 percent to $251.7 million,

25       including a 2.5 percent increase related to foreign currency. The

26       company achieved growth across each of its three major business units.

27           AMO reported first-quarter net earnings under Generally Accepted

28       Accounting Principles (GAAP) of $12.1 million, or $0.20 per diluted

1   share, compared to net earnings of $2.6 million, or $0.04 per diluted

2   share in the same period last year.

3                    *         *         *

4   *Eye Care sales rose 4.4 percent to $59.3 million.*

5   –       *Multipurpose sales rose 4.7 percent to $33.9 million.*

6   –       *U.S. COMPLETE® MoisturePlus™ solution sales rose*

7           *23.1 percent to $12.6 million, reflecting favorable market*

8           *share growth trends.*

9   –       *Eye care sales declined 29.3 percent and 15.1 percent in*

10          *Asia Pacific and Japan, respectively, reflecting the*

11          *impacts of the voluntary recall and temporary shutdown*

12          *of the company's manufacturing plant in China in late*

13          *2006.*

14  –       Hydrogen peroxide sales declined 2.6 percent to $13.8

15          million, reflecting the continued contraction of this market

16          in Japan and Europe.

17  Eye Care Manufacturing Update

18          *During the quarter, production resumed as planned on three of*

19  *the four manufacturing lines at the company's China facility, which*

20  *supplies primarily the Japanese and Asia Pacific markets. Eye care*

21  *product shipments also resumed to these markets during the first*

22  *quarter. The company expects to experience some supply shortages in*

23  *Asia Pacific and Japan through the second quarter of 2007, as supply*

24  *ramps up to meet demand.* The plant's fourth line is scheduled to begin

25  production in the next 30 to 45 days, consistent with the company's

26  original schedule. Production at the company's eye care manufacturing

27  facility in Spain, which supplies North American and European markets,

28  continued uninterrupted during this time.

The U.S. Food and Drug Administration (FDA) plans to conduct routine inspections of AMO's eye care manufacturing facilities in Spain and China during May and June 2007. AMO had indicated previously that such inspections were expected. The company is cooperating fully with the FDA and does not anticipate any impact to production as a result of the inspections.

Additional First-Quarter Highlights

Below are additional highlights of first-quarter 2007 results. Growth rates reflect comparisons to the same period one year ago.

> – **Gross profit rose 4.0 percent and included a $2.3 million negative impact from the recall and a $4.7 million non-cash charge related to the termination of the Amadeus™ microkeratome distribution agreement.** AMO decided to exit the mechanical microkeratome business effective May 1, following the completion of the IntraLase acquisition. Gross profit in the year-ago quarter included $3.2 million in charges related to rationalization and repositioning initiatives.

65. Subsequent to issuing its results, AMO hosted a conference call for analysts, media representatives and investors on April 25, 2007, during which defendants represented the following:

[MEIER:] Let me also update you on the launch of our next-generation Complete. Our original plan was to produce this product only at the Spain facility. Using lessons learned from the recall, we have now decided to expand validation activities to include both plants. This means we will delay our launch by one quarter to the first quarter of 2008 to ensure that we can meet anticipated demand and have adequate retail presence.

* * *

[MAZZO:] *Let me close by saying that we continue to be optimistic about the near-term and long-term potential of our Company.* As you can see, we have multiple opportunities to achieve our financial goals. Moving forward, we're focused on integrating the IntraLase business, on getting the manufacturing plant in China fully operational, continuing to transition our monofocal intraocular lenses to the Tecnis franchise, launching differentiated new products and aggressively pursuing opportunities to grow the procedure market and our share with our integrated refractive offering of refractive IOLs and laser technologies using our combination of refractive IOLs and lasers.

66.    These positive statements were false and misleading because, as described more fully herein, defendants failed to inform the market of the risk of potentially serious eye infections from using Complete, a disclosure which would have undercut defendants' positive statements. In fact, after AMO reformulated Complete in late 2002, the number of cases of AK – which is a relatively rare infection – increased dramatically. For example, clinicians at the Department of Ophthalmology at the University of Illinois at Chicago diagnosed 40 AK cases between June 1, 2003 and November 30, 2005 – nearly 7 times greater than the number of cases between June 1, 2000 and November 30, 2002. Additionally, in 95% of the cases diagnosed at the university, the patients wore contact lenses. Similarly, ophthalmologists at the Wills Eye Hospital in Philadelphia reported that they had diagnosed 19 patients with AK between January 2004 and August 2005 in contrast to 11 AK cases between 1999 and 2003. All 19 patients were using multi-purpose solutions for lens care. Thus, defendants knew, or were deliberately reckless in not knowing, that their statements during the Class Period were false and misleading because the problems related to Complete were not limited to Asia; instead, the change to Complete's formulation itself caused widespread outbreaks of AK.

- 34 -

67.     The introduction of soft silicone hydrogel contact lens in 2000 or 2001 also presented health issues when used in conjunction with certain multi-purpose solutions such as Complete – a fact that renders defendants' statements false and misleading.  AMO fully understood and recognized this risk: in a July 2006 article discussing a study that found that Complete performed significantly poorly in its ability to prevent corneal staining, AMO "acknowledges that the study is correct, and says the company recommends to doctors that its solution not be used with that particular brand of lens."  Despite this acknowledgment, defendants failed to adequately disclose during the Class Period the impact that such risk would have upon the Company's financial condition.

68.     Additionally, numerous studies emerged before and during the Class Period demonstrating that Complete was ineffective in its ability to prevent AK, demonstrating that defendants knew, or were deliberately reckless in not knowing, that their statements during the Class Period were false and misleading.  One study found that Complete "failed to have any impact" to withstand AK infections.  Another study found that "Complete MoisturePlus was less effective" than other multi-purpose solutions in its disinfection efficacy against AK.  In yet another study issued during the Class Period, researchers concluded that Complete was "relatively ineffective" in its ability to withstand AK and that "Complete was the least effective solution tested."  Thus, defendants knew, or were deliberately reckless in not knowing, that Complete was ineffective in its ability to prevent AK, in stark contrast to their positive statements to the market that the problem was isolated to Asia, that the Company's efforts addressing the November 2006 recall would eliminate the problems associated with Complete and that the financial outlook for the Company's eye care product line remained positive.

69.     Bausch & Lomb's April 2006 recall of its own multi-purpose solution – ReNu with MoistureLoc® – also alerted defendants to the risks posed by Complete.  Within a July 26, 2006 article, Lasswell, director of eye care clinical research at

1  AMO, referred to Bausch & Lomb's recall by stating that "[i]t was a wake-up call."
2  Indeed, after Bausch & Lomb's recall, defendants internally were very concerned
3  about whether AMO would experience a similar recall for Complete. According to
4  CW2, Senior Vice President Brady exuded a sense of nervousness after Bausch &
5  Lomb recalled ReNu with MoistureLoc®. CW2 believes that Brady was nervous at
6  the time because AMO could face with Complete the same type of recall that Bausch
7  & Lomb experienced with ReNu with MoistureLoc®. Similarly, according to CW3
8  and discussed more fully herein, CEO Mazzo expressed concern after Bausch &
9  Lomb's recall during an AMO meeting about the likelihood of a recall concerning
10 Complete. Indeed, CW4 had conversations with Planning Specialist Overley and
11 Quality Assurance team member Funk in which Overley and Funk indicated that they
12 both were not surprised by AMO's May 2007 recall of Complete. Thus, after Bausch
13 & Lomb's recall of its multi-purpose solution, defendants were aware of the
14 likelihood that the ineffectiveness of AMO's Complete to withstand AK infections
15 would also result in a recall. Nevertheless, defendants continued to make false and
16 misleading statements to assure investors that the problems with Complete were over.
17      70.     Defendants also knew – or were deliberately reckless in not knowing –
18 that their statements were false and misleading because they received and/or had
19 access to FDA adverse event reports before and during the Class Period demonstrating
20 the association between Complete and cases of AK. Through AERS, AMO customers
21 made formal complaints regarding serious eye infections and blindness, including AK,
22 that were attributed to Complete. For example, on September 28, 2006, one customer
23 made a report of contracting AK after using Complete and spending 10 days in the
24 hospital fighting the infection. On October 25, 2006, another customer logged a
25 report through AERS describing how the customer lost an eye because of contracting
26 AK after using Complete. An October 31, 2006 report details another case of AK in
27 which a father described how his son contracted AK after using Complete, required
28 nine months of treatment and developed a scar on his cornea that restricted his vision.

1    Additionally, according to CW1 and as described more fully herein, AMO was aware
2    of numerous cases of bacterial infections suffered by contact lens wearers associated
3    with Complete before the Company's May 25, 2007 recall. Similarly, according to
4    CW4 and as described more fully herein, AMO received calls from customers after
5    the 2003 launch of Complete who complained about corneal ulcers and burning eyes
6    after using Complete. Despite this information demonstrating the ineffectiveness of
7    Complete to prevent the onset of AK and the drastic increase in AK cases after
8    AMO's reformulation of Complete, however, defendants continued to disseminate
9    false and misleading information to investors regarding Complete and falsely assured
10   investors that any potential concerns related to Complete were under control and were
11   unrelated to the formula for Complete. As a result, the Company's stock performed
12   well, ***permitting the Individual Defendants to sell their AMO stock for proceeds of***
13   ***$6.8 million while the stock was inflated***. For example, on May 10, 2007 defendant
14   Heidrich sold 95,875 shares of his stock for proceeds of $3,947,618 – just weeks
15   before AMO publicly announced the recall of Complete.

16       71.   On May 24, 2007, just one day before AMO announced its recall of
17   Complete, the Company announced interest in the purchase of Bausch and Lomb,
18   stating in part:

19           "We believe it is only logical to explore this opportunity given the
20           highly complementary nature of our two businesses. Consideration of
21           this potential transaction is consistent with our existing strategy to
22           provide a full range of products that address vision care needs of people
23           of all ages. We believe that the current transaction with Warburg Pincus
24           undervalues Bausch & Lomb, and we plan to enter the go-shop process
25           with the intention of exploring a superior offer for the company. Of
26           course, we will only proceed with a transaction if after conducting
27           thorough due diligence, our Board of Directors determines it is in the
28           best interest of AMO stockholders."

- 37 -

72.    On May 25, 2007, AMO's stock closed at $40.20 per share.  After the market closed that same day, the Company issued a press release entitled "AMO Announces Voluntary Recall of Complete® MoisturePlus™ Multipurpose Solution." The press release stated in part:

> In response to information received today from the U.S. Centers for Disease Control and Prevention (CDC) regarding eye infections from Acanthamoeba, a naturally occurring water-borne organism which can contribute to serious corneal infections, Advanced Medical Optics is immediately and voluntarily recalling its Complete® MoisturePlus™ contact lens solutions.  CDC data was made available to AMO today showing that it had completed interviews with 46 patients who had developed Acanthamoeba keratitis (AK) since January 2005.  A total of 39 of these patients were soft contact lens wearers, 21 of whom reported using Complete® MoisturePlus™ products.  The CDC estimates a risk of at least seven times greater for those who used Complete® MoisturePLUS™ solution versus those who did not.
>
> While AMO continues to work with the CDC and the U.S. Food and Drug Administration (FDA) to further assess the data, it is acting with an abundance of caution to voluntarily recall Complete® MoisturePlus™ from the market.  There is no evidence to suggest that today's voluntary recall is related to a product contamination issue and this does not impact any of AMO's other contact lens care products, including our family of hydrogen peroxide disinfecting solutions.  As patient safety is paramount to AMO, the company is taking decisive action to stop shipments, recall product from the marketplace, and encourage consumers to discontinue the use of AMO Complete® MoisturePlus™ until further information is available.  Given the potential seriousness of the reported Acanthamoeba infections, AMO is

- 38 -

working in close partnership with the CDC, the FDA and others to make sure consumers are aware of the need for proper contact lens disinfection and proper lens handling.

Acanthamoeba is a microorganism commonly found in water, soil, sewage systems, cooling towers, and heating/ventilation/air conditioning (HVAC) systems. Acanthamoeba keratitis (AK) is a rare, but serious, infection of the cornea. AK is usually found among individuals who improperly store/handle/disinfect their lenses (*e.g.*, use tap water or homemade solutions for cleaning), swim/use hot tubs/shower while wearing lenses, come in contact with contaminated water, have minor damage to their corneas, or have previous corneal trauma. The incidence of AK in the United States has been estimated by CDC at approximately one to two cases per million contact lens users.

Contact lens wearers should consult with their eye doctor if they have any of the following symptoms: eye pain, eye redness, blurred vision, sensitivity to light, sensation of something in the eye, and excessive tearing. The symptoms, which can last several weeks to months, are not the same for everybody. Early in the infection, the symptoms of AK can be very similar to the symptoms of other more common eye infections but AK may eventually cause severe pain and possible vision loss with some patients requiring a corneal transplant if untreated.

73. The stock immediately collapsed on May 29, 2007, dropping $5.51 per share on volume of 16.2 million shares, eradicating the Company's gains in the year to date.

74. After the announcement of the recall, CEO Mazzo blamed consumers for the problem related to the recall: "[i]t's not a manufacturing problem or a contamination issue." Mazzo added that AK "affects people who improperly handle

- 39 -

1  contact lenses, such as disinfecting them with water or wearing them while swimming
2  or showering." Contact lens wearers who practice proper lens care, however, have
3  still developed AK. Additionally, as analysts at Bear Stearns & Co. Inc. noted, the
4  recall was indeed a manufacturing issue: "we think the issue with Complete MP most
5  likely stems from the solution's formulation given 1) The disproportionate number of
6  acanthamoeba cases involving the Complete MP product vs. competitive solutions, 2)
7  the unique chemical formulation of the product and 3) the presence of bacteria
8  formulation when in contact with other substances (air, water, contact lenses, corneal
9  surface)."

10    75.    According to CW1, AMO was aware of numerous cases of bacterial
11  infections suffered by contact lens wearers associated with Complete before the
12  Company's May 25, 2007 recall. According to CW1, Shannon Domino ("Domino")
13  was AMO's West Coast Consumer Service Manager, Lynda Kollar ("Kollar") was the
14  East Coast Customer Service Manager and Linda Pinahro ("Pinahro") oversaw all of
15  AMO's customer service personnel. Additionally, Mary Elizabeth Pierce was a senior
16  member of the customer service team who was responsible for training incoming
17  customer service specialists and who had been employed with Allergan for
18  approximately 25 years before AMO spun-off from Allergan in 2002. According to
19  CW1, members of AMO's customer service team left the office on Friday, May 25,
20  2007 unaware of AMO's recall. When CW1 arrived at work with her colleagues after
21  the weekend, Shannon Domino, Lynda Kollar and Linda Pinahro led a customer
22  service team meeting that they quickly arranged. During the meeting, Domino, Kollar
23  and Pinahro informed employees that AMO had received more than 600 calls from
24  doctors and customers over the weekend regarding the recall. Domino, Kollar and
25  Pinahro also established a customer service team during the meeting to address the
26  questions posed by AMO customers regarding the recall and designated specialists to
27  handle new calls that the Company received. In total, there were approximately 50
28

1  customer service specialists that were assigned to the team dedicated to the recall of

2  Complete.

3      76.     According to CW1, during the meeting, Domino, Kollar and Pinahro

4  indicated that AMO representatives were aware of at least five cases of bacterial

5  infections suffered by contact lens wearers who had used Complete before the recall.

6  According to CW1, Domino, Kollar and Pinahro also informed attendees at the

7  meeting that the AMO representatives who were aware of the numerous cases

8  incorrectly assumed that the bacterial infections were the result of poor hygiene or

9  improper use of lenses and lens cleaning products rather than caused by the

10  ineffectiveness of Complete.

11      77.     Additionally, according to CW1, AMO did not announce the recall of

12  Complete until the Company was forced to do so.  By May 25, 2007, according to

13  CW1, there were articles in medical journals that demonstrated a link between

14  Complete and incidents of AK.  According to CW1, moreover, the AK outbreaks

15  linked to Complete could not have been associated with specific lot numbers or a

16  particular geographic region because the more than 600 calls that AMO received were

17  from customers across the country.  If the recall had been specific to particular lot

18  productions, then the calls would have been localized to regions in which the lots were

19  distributed, which was not the case.  CW1 was aware of the calls that AMO received

20  concerning the May 25, 2007 recall because CW1 handled many of these calls.

21      78.     Defendants' statements about Complete were materially false and

22  misleading due to defendants' failure to disclose relevant information, including, but

23  not limited to:

24          (a)     the increased incidence of AK, along with its prevalence among

25  soft contact users, was a significant problem for future sales of Complete; and

26          (b)     the Company's future results would not be as favorable as

27  expected due to the increasing problems associated with Complete and AK.

28

79.     Defendants violated the federal securities laws by disseminating false and misleading statements to the investing public and concealing negative information, making it impossible for shareholders to gain a meaningful or realistic understanding of the product risks and long-term market success. Each of these misleading statements, in the form of press releases, conference calls and SEC filings, was well timed and calculated.   Each such statement regarding the Company's profitable contact lens solution, Complete, was tailored to deceive shareholders and to inflate the value of the Company.   In November 2006, the Company announced a voluntary recall of certain eye care product lots and the related manufacturing capacity constraints caused by a production-line issue at its manufacturing plant in China.  By the beginning of the Class Period, the defendants had successfully convinced the market that problems with Complete were in the past.

**POST CLASS PERIOD EVENTS**

80.     Investigation and research confirmed the extremely strong association between Complete and incidents of AK.   Based upon data collected as of June 25, 2007, the CDC determined that people with AK who used soft contact lenses were *at least 16 times more likely to have used Complete* compared with a group of healthy adult soft contact lens users.

81.     On July 31, 2007, the FDA reclassified AMO's May 25, 2007 recall from a voluntary recall to a Class 1 recall, which is the most serious type of recall and involves situations where there is a reasonable probability that the use of the product will cause serious injury or death.

82.     In August 2007, researchers published a study confirming the strong association between Complete and incidents of AK entitled *The Association of Contact Lens Solution Use and Acanthamoeba keratitis*. The study found that "AMO Complete MoisturePlus Multi-Purpose Solution use is independently associated with AK among soft contact lens users."   The study found:

- 42 -

Analyses performed with different dichotomous classifications of Complete MoisturePlus solution use, including restriction to single solution use and use of Complete MoisturePlus either alone or in combination with other solutions, resulted in consistent findings and identified Complete MoisturePlus use as independently associated with AK. The sensitivity analysis and also analysis of the subset of culture-positive cases (18 of 30 soft lens users) and their matched controls similarly identified Complete MoisturePlus use as independently associated with AK in multivariable analysis.

83.   The researchers stated that "[t]hese findings demonstrate that self-reported use of AMO Complete MoisturePlus Multi-Purpose Solution is an independent risk factor for AK among soft contact lens users." In fact, the study demonstrated that "[w]ith current classifications, there are three times more AK cases using Complete MoisturePlus compared with any other solution brand." The study also confirmed the findings of earlier studies: "Complete Multi-Purpose Solution is less effective than other multi-purpose solutions against cysts and trophozoites when tested using multiple *Acanthamoeba* genotypes, as well as alternative amoebicidal efficacy testing techniques." The study also concluded that "the risk presented by use of Complete MoisturePlus may be a relative inability to withstand an *Acanthamoeba* challenge compared with that of other solutions."

## DEFENDANTS' INSIDER TRADING

84.   While AMO's stock price was artificially inflated due to the concealment of Complete's ineffectiveness to prevent AK, certain of the Individual Defendants sold their AMO stock to benefit from the inflation:

- 43 -

| Individual Defendant | Date Sold | Shares | Price | Proceeds |
|---|---|---|---|---|
| Heidrich | 5/10/2007 | 63,715 | $41.09 | $2,618,049 |
| | 5/10/2007 | 19,114 | $41.09 | $785,394 |
| | 5/10/2007 | 9,500 | $41.87 | $397,765 |
| | 5/10/2007 | 2,700 | $41.29 | $111,483 |
| | 5/10/2007 | 546 | $41.27 | $22,533 |
| | 5/10/2007 | 300 | $41.31 | $12,393 |
| | Subtotal | 95,875 | | $3,947,618 |
| Mazzo | 4/27/2007 | 71,430 | $41.31 | $2,950,773 |
| | Subtotal | 71,430 | | $2,950,773 |
| **Total** | | **167,305** | | **$6,898,391** |

## NO SAFE HARBOR PROTECTION

85.     The statutory safe harbor protection does not apply to any of the false and misleading statements alleged in this Consolidated Complaint.  The statutory safe harbor protection also does not apply to AMO's false statements and additional misstatements and omissions of existing facts.  Defendants did not identify the specific statements pled herein as "forward-looking statements."  To the extent there were any purportedly forward-looking statements, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Additionally, to the extent that the statutory safe harbor protection does apply to any purportedly forward-looking statement pled herein, defendants are liable for such statements because, at the time that defendants made each such statement, they knew that the particular statement was false.

## CLASS ACTION ALLEGATIONS

86.     This is a class action on behalf of those who purchased or otherwise acquired AMO securities during the Class Period, excluding defendants, directors and officers of the Company and their families and affiliates (the "Class").  Class members are so numerous that joinder of them is impracticable.  At all relevant times, the markets for AMO securities were efficient.

1      87.    Common questions of law and fact predominate and include whether
2  defendants: (i) violated the Exchange Act; (ii) omitted and/or misrepresented material
3  facts; (iii) knew or recklessly disregarded that their statements were false; and
4  (iv) artificially inflated AMO's stock price and the extent of and appropriate measure
5  of damages.

6      88.    Lead plaintiff's claims are typical of those of the Class.  Prosecution of
7  individual actions would create a risk of inconsistent adjudications.  Lead plaintiff will
8  adequately protect the interests of the Class.  A class action is superior to other
9  available methods for the fair and efficient adjudication of this controversy.

10                    **LOSS CAUSATION/ECONOMIC LOSS**

11     89.    During the Class Period, as detailed herein, defendants engaged in a
12  scheme to deceive the market and a course of conduct that artificially inflated AMO's
13  stock price and operated as a fraud or deceit on Class Period purchasers of AMO
14  securities by concealing the link between Complete and the potential risk of
15  developing AK.   Later, however, when defendants' prior misrepresentations and
16  fraudulent conduct were disclosed and became apparent to the market, AMO's stock
17  price fell precipitously as the prior artificial inflation came out of AMO's stock price.
18  As a result of their purchases of AMO securities during the Class Period, lead plaintiff
19  and other members of the Class suffered economic loss, *i.e.*, damages, under the
20  federal securities laws.

21     90.    Defendants' false and misleading statements had the intended effect and
22  caused AMO's stock price to trade at artificially inflated levels throughout the Class
23  Period, reaching as high as $44.00 per share.

24     91.    On May 25, 2007, after the market closed, investors and the market
25  became aware that AMO's statements had been false and misleading and that AMO's
26  actual business prospects, which had long been obfuscated by the failure to disclose
27  the problems with Complete, were not as represented.   The prior artificial inflation
28  came out of AMO's stock price, damaging investors.

92.    As a direct result of defendants' admissions and the public revelations regarding the truth about Complete and its link to serious eye infections, AMO's stock price plummeted nearly 15%, on unusually high volume, falling from $40.20 per share at the open on May 25, 2007 to as low as $34.37 per share before closing at $34.69 on May 29, 2007, a one-day drop (May 25th was a Friday and the market was closed for Memorial Day on May 28th) of $5.51 per share. This drop removed the inflation from AMO's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

93.    The 15% decline in AMO's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of AMO's stock price declines negate any inference that the loss suffered by lead plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same day in which AMO's stock price fell 15% from $40.20 per share as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was up. The economic loss, *i.e.*, damages, suffered by lead plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate AMO's stock price and the subsequent significant decline in the value of AMO's securities when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of §10(b) of the Exchange Act
### Against All Defendants

94.    Lead plaintiff incorporates each of the previous paragraphs by reference.

95.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material

- 46 -

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

96.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    Employed devices, schemes, and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon lead plaintiff and others similarly situated in connection with their purchases of AMO securities during the Class Period.

97.    Lead plaintiff and Class members were damaged.  In reliance on the integrity of the market, they paid artificially inflated prices for AMO securities.

98.    The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

99.    Lead plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AMO securities. Lead plaintiff and the Class would not have purchased AMO securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

100.    Lead plaintiff incorporates each of the previous paragraphs by reference.

1      101. The Individual Defendants acted as controlling persons of AMO within

2 the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-

3 level positions, participation in and/or awareness of AMO's operations and/or intimate

4 knowledge of its internal financial condition and business practices, the Individual

5 Defendants had the power to influence and control, and did influence and control,

6 directly or indirectly, the decision-making of AMO, including the content and

7 dissemination of the various statements which lead plaintiff contends are false and

8 misleading. AMO controlled the Individual Defendants and all of its employees. The

9 Individual Defendants were provided with, or had unlimited access to, copies of

10 AMO's internal studies, reports, press releases, public filings and other statements

11 alleged by lead plaintiff to be misleading prior to and/or shortly after these statements

12 were issued and had the ability to prevent the issuance of the statements or cause the

13 statements to be corrected.

14      102. As set forth above, the defendants violated §10(b) of the Exchange Act

15 and Rule 10b-5 by their acts and omissions as alleged in this Consolidated Complaint.

16 By virtue of their positions as controlling persons, these defendants are liable pursuant

17 to §20(a) of the Exchange Act.

18      103. As a direct and proximate result of the wrongful conduct of defendants,

19 lead plaintiff and other members of the Class suffered damages in connection with

20 their purchases of AMO securities during the Class Period.

21                       **PRAYER FOR RELIEF**

22      WHEREFORE, lead plaintiff and the Class pray for judgment as follows:

23      A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ.

24 P. 23;

25      B.     Awarding lead plaintiff and the members of the Class damages against all

26 defendants, jointly and severally, including prejudgment and post-judgment interest;

27      C.     Awarding lead plaintiff and the Class reasonable costs, expenses and

28 attorneys' fees; and

1        D.    Awarding such equitable/injunctive or other relief as the Court may deem

2   just and proper.

3                              **JURY DEMAND**

4        Lead plaintiff and the Class demand a trial by jury.

5

6   DATED:  January 18, 2008          COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
7                                     EX KANO S. SAMS II

8

9                                            EX KANO S. SAMS II

10                                    9601 Wilshire Blvd., Suite 510
                                      Los Angeles, CA  90210
11                                    Telephone:  310/859-3100
                                      310/278-2148 (fax)
12
                                      COUGHLIN STOIA GELLER
13                                       RUDMAN & ROBBINS LLP
                                      DARREN J. ROBBINS
14                                    TRICIA L. McCORMICK
                                      655 West Broadway, Suite 1900
15                                    San Diego, CA  92101
                                      Telephone:  619/231-1058
16                                    619/231-7423 (fax)

17                                    Lead Counsel for Plaintiff

18   U:\CasesLA\Advanced Medical Optics\CPT00048300.doc

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a resident of the County of Los Angeles, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 9601 Wilshire Blvd., Suite 510, Los Angeles, California 90210.

2.    That on January 18, 2008, declarant served the CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at Los Angeles, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of January, 2007, at Los Angeles, California.

KELLY L. EAGEN

ADVANCED MEDICAL OPTICS
(LEAD)
Service List - 1/18/2008     (07-0179)
Page 1 of 1

**Counsel For Defendant(s)**

Richard H. Zelichov
Bruce G. Vanyo
Marisa  Westervelt
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA  90067
   310/788-4400
   310/788-4471 (Fax)


**Counsel For Plaintiff(s)**

Ex Kano S. Sams II
Coughlin Stoia Geller Rudman & Robbins LLP
9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210
   310/859-3100
   310/278-2148 (Fax)