1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   SCOTT KAIRALLA,                           )   NO. CV 07-05569 SJO (PLAx)
                                               )
12              Plaintiff,                     )   **ORDER GRANTING DEFENDANTS' MOTION**
                                               )   **TO DISMISS**
13        v.                                   )   [Docket No. 37]
                                               )
14   ADVANCED MEDICAL OPTICS, INC. et          )
     al.,                                      )
15                                             )
                Defendants.                    )
16   _____       )

17        This matter is before the Court on Defendants Advanced Medical Optics, Inc. ("AMO"),

18   James Mazzo, Richard Meier, Holger Heidrich, Aimee Weisner, and Leonard Borrmann's

19   (collectively, "Defendants") Motion to Dismiss, filed February 29, 2008. Lead Plaintiff NECA-IBEW

20   Pension Fund ("Plaintiff") filed an Opposition, to which Defendants replied.[1] The Court found the

21   matter suitable for disposition without oral argument and vacated the hearing set for

22   April 28, 2008. *See* Fed. R. Civ. P. 78(b). For the following reasons, Defendants' Motion is

23   GRANTED.[2]

24   _____

25        [1] Plaintiff argues that the Motion should be denied because Defendants failed to meet and
     confer as required by Local Rule 7-3. Counsel are expected to comply strictly with the Local Rules.
26   Although Defendants did not do so in this instance, the Court will not deny the Motion on this
     basis, as Plaintiff had approximately one month's notice that Defendants would be filing a motion
27   to dismiss. (Zelichov Decl. II ¶ 3.)

28        [2] Plaintiff and Defendants both request judicial notice of a multitude of materials. The Court
     does not, in its disposition of the matter, consider any of those materials objected to by the

I.    <u>BACKGROUND</u>

AMO develops, manufactures, and markets medical products for the eye, including products for use with contact lenses. (Consolidated Compl. ("Compl.") ¶ 4.) One such product is Complete MoisturePLUS Multi-Purpose Solution ("Complete"), a single-bottle, multi-purpose solution designed to clean, disinfect, and store soft contact lenses. (Compl. ¶ 5.) The product generates over ten percent of AMO's annual sales. (Compl. ¶ 37.)

In November of 2006, AMO announced a voluntary recall of certain lots of Complete, claiming that bacterial contamination had compromised the product's sterility. (Compl. ¶ 12.) In the months following, AMO and its officers made statements regarding AMO's financial condition and the problems associated with Complete. (Compl. ¶ 12.) Plaintiff claims that these statements "assured the market" that the problems associated with the recall were isolated to the company's production facility in Asia and that prospects for Complete were favorable. (Compl. ¶ 12.)

On May 25, 2007, AMO initiated a global recall of Complete, after receiving information from the Center for Disease Control ("CDC") indicating an association between the use of Complete and *Acanthamoeba* keratitis ("AK"), an eye infection of the cornea. (Compl. ¶ 13.) In the days following this second recall, AMO's stock fell $5.51 per share, closing at $34.69, a decline of fourteen percent. (Compl. ¶ 14.) Research conducted after the recall confirmed the CDC preliminary finding of an independent association between Complete and AK. (Compl. ¶ 15.)

Plaintiff brings the instant lawsuit on behalf of all persons and entities who purchased or acquired AMO securities between January 4, 2007, and May 25, 2007 (the "Class Period"), against AMO and five of its officers for violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule ("SEC Rule") 10b-5. Plaintiff also brings a claim against AMO's officers under § 20(a) of the Exchange Act. According to Plaintiff, because Defendants knew or should have known that there was a formula problem with Complete before the second recall, their statements during the Class Period were misleading,

opposing party. Thus, the Court GRANTS the parties' respective requests for judicial notice but only to the extent that they are unopposed.

1  causing AMO's stock price to trade at "inflated levels" and causing the plaintiff class to suffer

2  economic loss when the stock price dropped after the second recall. (Compl. ¶¶14-15.)

3        Defendants move to dismiss Plaintiff's claims arising under § 10(b) of the Exchange Act,

4  SEC Rule 10b-5, and § 20(a) of the Exchange Act, for failure to state a claim upon which relief can

5  be granted under Federal Rule of Civil Procedure ("Federal Rule") 12(b)(6). Defendants also move

6  to dismiss Defendant Heidrich for lack of personal jurisdiction under Federal Rule 12(b)(2).

7  II.   <u>DISCUSSION</u>

8      A.   <u>Motion to Dismiss Pursuant to Federal Rule 12(b)(6)</u>

9        Dismissal is appropriate under Federal Rule 12(b)(6) if the complaint lacks a "cognizable

10  legal theory" or "sufficient facts alleged under a cognizable legal theory," *Balistreri v. Pacifica*

11  *Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988), or if it fails to allege "enough facts to state a claim

12  to relief that is plausible," *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). "Faced with

13  a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for

14  failure to plead a claim on which relief can be granted, accept all factual allegations in the

15  complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). The

16  allegations, as well as any reasonable inferences to be drawn from them, are construed in the light

17  most favorable to the plaintiff, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*

18  *W. Holding Corp.*, 320 F.3d 920, 930 (9th Cir. 2003), and the complaint is considered in its

19  entirety, including documents incorporated by reference, *Tellabs*, 127 S. Ct. at 2509.

20       1.   <u>Section 10(b) and SEC Rule 10b-5 Claim</u>

21        Section 10(b)[3] and SEC Rule 10b-5[4] create a private right of action "which resembles, but

22  is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharm., Inc.*

23  

24     [3] "It shall be unlawful for any person . . . to use or employ, in connection with the purchase

25  or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b).

26  

27     [4] SEC Rule 10b-5, promulgated under the authority of § 10(b), extends liability to any person who "make[s] any untrue statement of a material fact" or "omit[s] to state a material fact

28  necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

1   *v. Broudo*, 544 U.S. 336, 341 (2005). In cases involving publicly traded securities, the action's

2   elements include: (1) a material misrepresentation or omission; (2) scienter; (3) reliance; (4) a

3   connection with the purchase or sale of a security; (5) economic loss; and (6) loss causation. *Id.*

4   at 341-42. Defendants argue that the Complaint is inadequate as to the first three elements.

5       To survive a motion to dismiss, a complaint alleging a securities fraud violation must satisfy

6   the heightened pleading requirements of the Public Securities Litigation Reform Act of 1995

7   ("PSLRA"). *Id.* at 345. Under the PSLRA, a complaint alleging a securities fraud violation must

8   plead, with particularity, that the defendant made a false or misleading statement and acted with

9   scienter. 15 U.S.C. § 78u-4(b). If either of these elements has not been sufficiently pled, "the

10  [C]ourt shall, on motion of any defendant, dismiss the complaint." 15. U.S.C. § 78u-4(b)(3)(A); *see*

11  *also No. 84 Employer-Teamster*, 320 F.3d at 931-32 (holding that dismissal is proper if the

12  complaint fails to sufficiently allege either misleading statements or scienter "with particularity").

13                    a.    The Alleged Misrepresentations

14      In order to succeed on a claim under § 10(b) and SEC Rule 10b-5, a plaintiff must establish

15  that the defendant made a "material misrepresentation or omission." *Stoneridge Inv. Partners, LLC*

16  *v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008). As noted, the PSLRA raises the pleading

17  requirements for alleging misrepresentation. A complaint alleging that a defendant made such a

18  statement must "specify each statement alleged to have been misleading," as well as "the reason

19  or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Furthermore, "if an

20  allegation regarding the statement or omission is made on information or belief, the complaint shall

21  state with particularity all facts on which that belief is formed." *Id.*

22      Defendants contend that Plaintiff fails to meet the particularity requirements of the PSLRA

23  because Defendants' statements during the Class Period are not false or misleading.[5] Plaintiff

24  _____

25      [5] Defendants also argue that because Plaintiff has not alleged that Heidrich and Weisner
    *themselves* made any false or misleading statements, Plaintiff's claim against those Defendants

26  must be dismissed. (Mot. 8 ("[Plaintiff] has wholly failed to plead that defendants Holger Heidrich
    and Aimee Weisner made *any* statements [whatsoever].") (emphasis added).) However, the Ninth

27  Circuit has expressly held that a defendant is not required to actually make a statement herself
    to be liable under § 10(b). *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000)

28  ("[S]ubstantial participation or intricate involvement in the preparation of fraudulent statements is

1    does not allege that Defendants' statements were misleading because they were literally false.

2    Rather, Plaintiff claims that the statements were misleading because "defendants failed to inform

3    the market of the risk of potentially serious eye infections from using Complete, a disclosure which

4    would have undercut defendant's positive statements." (Compl. ¶ 66.) In essence, Plaintiff alleges

5    that Defendants' omission of information caused their statements to be misleading.

6         "To be actionable under the securities laws, an omission must . . . affirmatively create an

7    impression of a state of affairs that differs in a material way from the one that actually exists."

8    *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Statements are not

9    misleading where they are "not necessarily inconsistent with the underlying true facts." *In re*

10   *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 n.7 (9th Cir. 2002). Furthermore, optimistic

11   predictions are not misleading where no facts have been alleged that would support an inference

12   that the statements were known to be false or misleading at the time the speaker made them.

13   *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001).

14        Plaintiff has cited fifteen allegedly misleading statements, which can be separated into the

15   following three categories: (a) general statements of historical fact; (b) retrospective statements

16   regarding the November 2006 recall; and (c) prospective statements of corporate optimism.

17                          i.    General Statements of Historical Fact

18        The first category of statements includes general statements by Defendants of historical

19   fact regarding past company actions and sales performance. These statements are:

20   •    An AMO press release: "U.S. sales of COMPLETE® MoisturePlus™ rose 48.1 percent for

21        the year and 25.7 percent in the fourth quarter. According to IRI, an independent market

22        research firm, COMPLETE® MoisturePlus™ dollar share of the U.S. branded multipurpose

23        solution market was 12.8 percent for the four weeks ended January 28, 2007, representing

24        an approximate 11 percent increase since the beginning of 2006." (Compl. ¶ 59.)

25

26   grounds for primary liability even though that participation might not lead to the actor's actual
     making of the statements."). Here, Plaintiff alleges that Heidrich and Weisner were "involved in
27   drafting, producing, reviewing and/or disseminating the false and misleading statements . . . ."
     (Compl. ¶¶ 20-21.) These allegations sufficiently state a claim that both Heidrich and Weisner
28   "made" false or misleading statements.

- An AMO press release: "Eye Care sales rose 4.4 percent to $59.3 million. Multipurpose sales rose 4.7 percent to $33.9 million. U.S. COMPLETE® MoisturePlus™ solution sales rose 23.1 percent to $12.6 million, reflecting favorable market share growth trends. Eye care sales declined 29.3 percent and 15.1 percent in Asia Pacific and Japan, respectively, reflecting the impacts of the voluntary recall and temporary shutdown of the company's manufacturing plant in China in late 2006." (Compl. ¶ 64.)

- An AMO press release: "Gross profits rose 4.0 percent and included $2.3 million negative impact from the recall and a $4.7 million non-cash charge related to the termination of the Amadeus™ microkeratome distribution agreement." (Compl. ¶ 64.)

Plaintiff claims these statements are misleading because Defendants failed to inform the market of "potentially serious eye infections from using Complete . . . ." (Compl. ¶ 66.) According to Plaintiff, Defendants had a duty to disclose information in their possession indicating an association between Complete and AK. (Opp'n 7.)

Plaintiff's argument is unavailing. *See Brody*, 280 F.3d at 1006 ("[Plaintiffs] err when they argue that in order for a statement not to be misleading, 'once a disclosure is made, there is a duty to make it complete and accurate.' This proposition has no support in case law. SEC Rule 10b-5 . . . prohibit[s] only misleading and untrue statements, not statements that are incomplete."). Even assuming that Defendants were aware of the association between their product and the eye disease, these statements are not misleading. They create no "impression of a state of affairs," in this case that Complete is not associated with AK, "that differs in a material way from the one that actually exists," that Complete is associated with AK. *Id.* at 1006 (rejecting plaintiffs' allegations that defendants' statements were misleading where defendants did not inform investors of a possible takeover because the statements did not "affirmatively intimate[] that *no* merger was imminent"). In fact, these statements create no affirmative impression, either way, regarding the association between Complete and AK, or the lack thereof. *See id.* ("If the press release had affirmatively intimated that no merger was imminent, it may well have been misleading. The actual press release, however, neither stated nor implied anything regarding the merger.").

6

Accordingly, Plaintiff's claim for a violation of Section 10(b) and SEC Rule 10b-5 based on these statements is DISMISSED.

ii.      <u>Retrospective Statements Regarding the November 2006 Recall</u>

The second category of statements includes statements by the Defendants in reference to the November 2006 recall. These statements are:

- A statement by Defendant Borrmann, when asked about the November 2006 recall: "Actually, we're making outstanding progress on that." (Compl. ¶ 58.)

- A statement by Defendant Borrmann, when asked about the November 2006 recall: "So we are really happy with the progress, and everything is right on track. I also want to point out that this challenge that we have had, has been limited exclusively to our China facility." (Compl. ¶ 58.)

- An AMO press release: "Last November [2006], the company commenced a recall of approximately 2.9 million units of its eye care products from the Asia Pacific, Japan and U.S. markets due to a production-line issue at its China manufacturing facility. To resolve the recall, the company also announced a 10-12 week plant closure to clean and sanitize the facility and conduct an already-planned expansion, which is now nearing completion." (Compl. ¶ 59.)

- An AMO press release: "We successfully repositioned our eye care business by streamlining our offering to focus on higher-margin products, while aggressively addressing the recall at the end of the year." (Compl. ¶ 59.)

- A statement by Defendant Mazzo in a conference call for media representatives and analysts hosted by AMO: "We also managed through some difficult challenges including the November [2006] voluntary eye recall due to a production line issue at our China facility. We acted swiftly and responsibly to remove affected product, communicate with customers, keep regulatory bodies informed, and take appropriate corrective actions. . . . I believe we've done everything possible to minimize the recall's impact including sticking

1  to our original timeline to bring the plant back online and begin re-supplying the affected

2  markets in the first quarter of '07." (Compl. ¶ 60.)

3  •  A statement by Defendant Meier in a conference call for media representatives and

4  analysts hosted by AMO: "To date we have closed the recall initiatives with a number of

5  these regulatory groups in the Asia-Pacific region. We expect to close the issue with both

6  the China and Japanese agencies over the next three or four weeks, and are targeting the

7  end of March, early April, to conclude our recall activities with the FDA." (Compl. ¶ 60.)

8  •  A statement by Defendant Mazzo in a conference call for analysts and media

9  representatives: "Now, moving to our eye care arena, obviously we had a little bit of an

10  impact in the fourth quarter with our recall . . . out of our China facility for one of our product

11  lines." (Compl. ¶ 62.)

12  •  A statement by Defendant Mazzo in a conference call for analysts and media

13  representatives: "The recall predominantly impacted Asia-Pacific and Japan. Our Spanish

14  facility, which meets all of our European needs as well as our U.S. needs were not

15  impacted from that end. It was not a formula issue; it was a product line, one of the

16  manufacturing lines that forced us to close down our China facility." (Compl. ¶ 62.)

17  •  A statement by Defendant Mazzo in a conference call for analysts and media

18  representatives: "Well, again, this is not a formula issue." (Compl. ¶ 62.)

19  •  A press release entitled "Advanced Medical Optics Announces First-Quarter 2007 Results":

20  "During the quarter, production resumed as planned on three of the four manufacturing

21  lines at the company's China facility, which supplies primarily the Japanese and Asia

22  Pacific markets. Eye care product shipments also resumed to these markets during the first

23  quarter. The company expects to experience some supply shortages in Asia Pacific and

24  Japan through the second quarter of 2007, as supply ramps up to meet demand." (Compl.

25  ¶ 64.)

26  Plaintiff argues that the above statements were misleading because Defendants did not

27  disclose that they were aware of adverse information regarding Complete. The Court disagrees.

28  Like the statements in the first category, these statements do not create an "impression of a state

1  of affairs" that differ materially from the underlying true facts. The statements were made in the

2  context of discussions regarding the November 2006 recall and do not intimate anything about the

3  association, or the lack of an association, between Complete and AK.[6] To the extent that the

4  statements offer reassurance that the November 2006 recall was progressing successfully, these

5  statements are not misleading because Plaintiff has offered no allegations supporting an inference

6  that the recall effort was not under control. *See In re Vantive*, 283 F.3d at 1088 (dismissing

7  plaintiff's claim under Section 10b and SEC Rule 10b-5 where there were insufficient details in the

8  allegations that would make the representations false or misleading).

9       Accordingly, Plaintiff's claim for a violation of § 10(b) and SEC Rule 10b-5 based on these

10  statements is DISMISSED.

11              iii.    Prospective Statements of Corporate Optimism

12       The third category of statements includes statements of corporate optimism. These

13  statements are:

14  •    A statement by Defendant Meier in a conference call for media and analysts hosted by

15       AMO: "From a regulatory perspective, we continue to be on track as well. Throughout the

16       recall process, AMO has maintained excellent relations with regulatory bodies around the

17       world." (Compl. ¶ 60.)

18  •    A statement made by Defendant Mazzo in a conference call for analysts, media

19       representatives, and investors: "Let me close by saying that we continue to be optimistic

20       about the near-term and long-term potential of our Company." (Compl. ¶ 65.)

21       Again, Plaintiff argues that these statements were false and misleading because

22  "defendants were aware that the issues related to Complete were not limited to China . . . and that

23  AMO still faced the likelihood of a recall because of Complete's formula . . . ." (Opp'n 10-11.) The

24  Court finds, however, that these statements are not misleading. Instead, the statements are more

25

26       [6] Had the November 2006 and May 2007 recalls been caused by the same problem, then
    the statements might be misleading if the problem causing the November 2006 recall, contrary to
27  Defendants' statements, was not in fact under control. However, Plaintiff has not specifically
    alleged that the two recalls arose from the same problem and there are no facts alleged in the
28  Complaint that would give rise to that inference.

like optimistic corporate statements, or corporate "puffery." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (stating that "generalized, vague and unspecific assertions, constituting mere 'puffery'" do not constitute misrepresentation). Furthermore, as demonstrated in the next section, insufficient facts are alleged in the Complaint "that would support an inference that the company's more optimistic predictions were known to be false or misleading at that time by the people who made them." *See Ronconi*, 253 F.3d at 430.

Accordingly, Plaintiff's claim for a violation of Section 10(b) and SEC Rule 10b-5 based on these statements is DISMISSED.

### b.   Scienter

"To establish liability under §10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 127 S. Ct. at 2507 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)). The PSLRA creates heightened pleading requirements for alleging scienter: a plaintiff must allege "with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see also In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848-49 (9th Cir. 2003) (holding that facts establishing a "reasonable inference" of scienter were insufficient to meet the pleading requirements of the PSLRA). In a securities fraud claim, establishing the "required state of mind" means that a plaintiff "must provide, in great detail, all the relevant facts forming the basis of her belief" that the defendant has acted with "deliberate recklessness or intent." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999).

In determining whether a plaintiff has alleged facts giving rise to a "strong" inference of scienter courts must "review[] the complaint in its entirety to determine whether the totality of the facts and inferences demonstrate a strong inference of scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . ." *Tellabs,* 127 S. Ct. at 2509. However, "[t]he strength of an inference cannot be decided in a vacuum." *Id.* at 2510. Plausible opposing inferences must also be taken into account. *Id.* at 2509. Courts are to "consider *all* reasonable inferences to be drawn

from the allegations, including inferences unfavorable to the plaintiff," *Gompper*, 298 F.3d at 897, to determine whether the inference of scienter is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 127 S. Ct. at 2504-05.

Plaintiff offers a number of allegations purporting to provide circumstantial evidence of scienter. Specifically, Plaintiff offers: (1) statements by confidential witnesses; (2) allegations of suspicious insider stock sales; and (3) various adverse effect reports and scientific studies. The Court considers each of these allegations in turn, and then considers whether the allegations "taken collectively" give rise to a strong inference of "deliberate recklessness or intent." *See No. 84 Employer-Teamster*, 320 F.3d at 938 ("Beyond each individual allegation [courts] also consider whether the total of plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.").

i.      The Statements by Plaintiff's Confidential Witnesses Do Not Give Rise to an Inference of Scienter.

Plaintiff provides accounts by four confidential witnesses, former employees of AMO, which Plaintiff contends support an inference of scienter. Plaintiffs may rely on information by unnamed sources "so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Further, the complaint must contain "adequate corroborating details" that demonstrate the information's reliability. *Id.* Here, Defendants do not dispute that Plaintiff has described the confidential witnesses with sufficient specificity. Instead, Defendants argue that the information provided by these witnesses fails to support an inference of scienter. (Mot. 17-18.) The Court agrees with Defendants.

The first confidential witness ("CW1") was a Customer Service Specialist for AMO who began working for AMO in March of 2007. (Compl. ¶ 26.) According to CW1, AMO was aware of "numerous cases" of bacterial infection suffered by contact lens wearers who used Complete. (Compl. ¶ 75.) CW1 claims to have been present at customer service representative meetings immediately following the May 2007 recall. (Compl. ¶¶ 75-76.) At one such meeting, CW1 learned from customer service managers that AMO had received over 600 calls from concerned doctors

1  and customers the weekend after the recall.[7] (Compl. ¶ 75.) CW1 also learned that approximately

2  fifty customer service specialists had been assigned to deal with customer concerns stemming

3  from the recall. (Compl. ¶ 75.) This information relates to AMO's actions after the recall and thus

4  does not imply anything relevant regarding AMO or AMO's officers' states of mind *prior* to the

5  recall.

6         Also according to CW1, by the time of the May 2007 recall "there were medical journals that

7  demonstrated a link between Complete and [AK]." (Compl. ¶ 77.) This allegation lacks "adequate

8  corroborating details" to support an inference of scienter. Plaintiff has not identified the journals

9  to which CW1 was referring, nor what, specifically, these journals stated to support CW1's

10 conclusion.

11        The second confidential witness ("CW2") was a Research and Development Laboratory

12 Technician at AMO from August 2003 until June 2006. (Compl. ¶ 27.) According to CW2, Senior

13 Vice President Brady "exuded a sense of nervousness" after Bausch & Lomb experienced a major

14 recall with one of their contact lens solutions in April of 2006. (Compl. ¶ 49.) "CW2 believe[d] that

15 Brady was nervous at the time because AMO could face with Complete the same type of recall

16 that Bausch & Lomb experienced . . . ." (Compl. ¶ 49.) Plaintiff has not described what specific

17 facts formed the basis for CW2's belief that Brady's nervousness was due to a potential recall.

18 Accordingly, a finding of scienter based on CW2's observation is unwarranted.

19        The third confidential witness ("CW3") served as an Administrative Assistant to Regulatory

20 Affairs Directors at AMO from November 2005 until February 2006. (Compl. ¶ 28.) According to

21 CW3, at a meeting discussing Bausch & Lomb's recall, Defendant Mazzo told participants "that

22 Bausch & Lomb was a much larger company than AMO and that if AMO faced a similar recall

23 related to Complete, the impact would be much more substantial to the Company." (Compl. ¶ 50.)

24 As with CW2, Plaintiff has failed to make any allegations that would explain how Defendant

25 Mazzo's statement that if AMO faced a recall the company would be substantially affected gives

26 _____

27        [7]  Plaintiff also alleges that, at the meeting, CW1 learned that AMO was aware of at least
   five cases of bacterial infection before the May 2007 recall. This allegation is addressed below in
28 Part II.A.1.b.iii.

1   rise to an inference of scienter. Without more, the statement merely seems to reflect the
2   unsurprising view that, in the event of a recall, the company would be substantially affected.

3       Also, according to CW3, during a regulatory affairs meeting "participants discussed the
4   development of a replacement product for Complete, one that would substitute a then-existing
5   ingredient with a replacement ingredient." (Compl. ¶ 50.) This statement bears no relevance, in
6   the absence of more specific allegations, to a determination that AMO and its officers acted with
7   scienter. This report simply indicates that AMO was considering changing one of its products, not
8   that Defendants were *aware* of any problem with the product.

9       The fourth confidential witness ("CW4") worked as a Product Specialist and Associate
10  Sales Analyst at AMO for nine years. (Compl. ¶ 29.) CW4 claims to have had conversations with
11  an AMO Planning Specialist and a Quality Assurance team member in which both employees
12  indicated they "were not surprised by AMO's May 2007 recall of Complete."[8] (Compl. ¶ 50.) This
13  statement does not give rise to an inference of scienter because Plaintiff has failed to plead with
14  specificity what the AMO employees meant when they said they were not surprised about the May
15  2007 recall and how this lack of surprise supports an inference of scienter.

16              ii.    Insider Stock Sales Do Not Give Rise to a Strong Inference of
17                     Scienter.

18      Plaintiff alleges that insider stock sales by Defendants Heidrich and Mazzo provide
19  circumstantial evidence of scienter. While "suspicious" stock sales by corporate insiders can
20  provide circumstantial evidence of bad faith or intent to defraud, insider trading is suspicious only
21  when it is "dramatically out of line with prior trading practices at times calculated to maximize
22  personal benefit from undisclosed inside information." *In re Silicon Graphics*, 183 F.3d at 1001.
23  In determining whether stock sales are "dramatically out of line with prior trading practices," courts
24  consider a number of factors, including: (1) the amount and percentage of shares sold by the
25  insiders; (2) the timing of the sales; (3) whether the sales were consistent with the insider's prior

26  _____

27      [8] CW4 also claims to have received calls from customers who complained of developing
    corneal ulcers and burning eyes after using Complete. (Compl. ¶ 56.) This allegation is addressed
28  below in Part II.A.1.b.iii.

1   trading history; and (4) the trading behavior of other insiders. *See No. 84 Employer-Teamster*, 320

2   F.3d at 938; *Ronconi*, 253 F.3d at 434-37. A plaintiff relying on insider trading to support a

3   securities fraud claim "must allege sufficient context of insider trading for [the court] to determine

4   whether the level of trading is dramatically out of line with prior trading practices." *Ronconi*, 253

5   F.3d at 436-37.

6          As to the amount and percentage of shares sold, Plaintiff alleges that Defendant Heidrich

7   sold 26% of his shares for approximately $4 million, and Defendant Mazzo sold 10% of his shares

8   for approximately $3 million. (Opp'n 22.) Defendant Mazzo's sale is not suspicious. *See Ronconi*,

9   253 F.3d at 435 (holding that sales of 10% and 17% of holdings were not suspicious). Although

10  Defendant Heidrich's sale is slightly more than the 17% found non-suspicious in *Ronconi*, the

11  amount is not, without more, highly suspicious. *See In re Vantive*, 283 F.3d at 1093 (holding that,

12  although a sale of 74% was suspicious, a strong inference of scienter was not raised because

13  analysis of the remaining factors did not raise suspicion).

14         As to the timing of these sales, Defendant Heidrich's sale was made while the AMO stock

15  was at its peak of $41 per share, and within two weeks of the May 2007 recall, while Defendant

16  Mazzo's sale was made one month before the recall, also at the stock's peak, and just two days

17  after making optimistic statements regarding AMO's viability. (Opp'n 22.) The timing of these sales

18  appears slightly suspicious, although the suspiciousness of Defendant Heidrich's sale is somewhat

19  rebutted in that it was made shortly after AMO's first quarter earnings announcement. *See Lipton*

20  *v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (holding that stock sale following the

21  public release of quarterly earning statements is common and therefore not suspicious).

22         As to the prior trading history of the Defendants, Plaintiff claims that, at the time of the

23  allegedly suspicious sales, neither Defendant Heidrich nor Defendant Mazzo had sold AMO stock

24  in over five years. (Opp'n 23.) However, SEC filings show that Defendant Mazzo sold almost the

25  same amount of AMO stock during the Class Period as he had in the months immediately

26  preceding the Class Period. (Zelichov Decl. Ex. 6 at 59 (showing Defendant Mazzo's sale of

27  approximately 10% of his stock holdings in AMO occurring in December of 2006).) Thus,

28  Defendant Mazzo's prior trading history does not render his stock sales during the Class Period

1   suspicious. On the other hand, Defendants do not dispute Plaintiff's allegations as to Defendant

2   Heidrich. Assuming that Plaintiff's allegations are true, Defendant Heidrich's stock sales appear

3   suspicious under this factor.

4        As to the fourth factor, the trading behavior of other insiders, Plaintiff has only made

5   allegations of suspicious stock sales against two of the five AMO officers named as Defendants.

6   *See Ronconi*, 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference'

7   required by the [PSLRA] where the rest of the equally knowledgeable insiders act in a way

8   inconsistent with the inference that the favorable characterizations of the company's affairs were

9   known to be false when made."). The lack of suspicious trading behavior on behalf of the other

10  insiders suggests that Defendants Heidrich and Mazzo's stock sales were not suspicious.

11       In sum, the above factors raise a slight inference of scienter only as to Defendant Heidrich.

12                    iii.    The Adverse Effect Reports and Scientific Studies Do Not Give

13                            Rise to a Strong Inference of Scienter.

14       Plaintiff alleges that reports by AMO customers of adverse effects from using Complete

15  provide evidence of scienter by showing that Defendants were aware of an association between

16  Complete and incidents of AK. (Mot. 17.) During a meeting with customer service representatives,

17  CW1 learned that "AMO representatives were aware of at least five cases of bacterial infections

18  suffered by contact lens wearers who had used Complete before the recall." (Compl. ¶ 76.) Also,

19  according to CW4, the company had "received calls from customers" after the launch of Complete

20  in 2003 "complain[ing] about corneal ulcers and burning eyes." (Compl. ¶ 56.) Lastly, Plaintiff

21  alleges that AMO received reports from the FDA's Adverse Event Reporting System ("AERS") of

22  three AMO customers claiming to have developed AK after using Complete. (Compl. ¶¶ 54-55.)

23       These adverse effect reports give rise, at most, to only a slight inference of scienter.

24  Complete accounts for over $100 million of AMO's sales (Compl. ¶ 37). In light of this large market

25  share, the eight complaints cited by Plaintiff comprise only a minuscule number of AMO's

26  customers and thus do not indicate a meaningful relationship between Complete and AK. *See In*

27  *re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000) (rejecting plaintiffs' claims for

28  securities fraud where defendant, a pharmaceutical company, was aware of at least fifty-six

adverse medical reports, including six deaths, related to their product); *id.* ("Drug companies need not disclose isolated reports of illnesses suffered by users of their drugs until those reports provide statistically significant evidence that the ill effects may be caused by–rather than randomly associated with–use of drugs . . . .").

The fact that the adverse reports came directly from customers also weakens their persuasiveness. The FDA cautions the weight that should be given to AERS adverse reports. *See* 21 C.F.R. § 314.80(k) ("A report or information submitted by an applicant under this section (and any release by FDA of that report or information) does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse effect."); *see also In re Carter Wallace*, 220 F.3d at 41 (noting that adverse medical reports from the FDA do not establish a causal link between a drug and adverse side effects because the FDA creates the adverse report "regardless of whether or not the illness had anything to do with [the drug]"). And as to the customer complaints relayed by CW1 and CW4, "[t]hese reports suggest only that the[] adverse events occurred, not that they reflect any meaningful or statistically significant relationship" between Complete and AK. *See In re Elan Corp. Sec. Litig.*, No. 05 Civ. 2869, 2008 WL 839744, at *17 (S.D.N.Y. Mar. 27, 2008).

Plaintiff further alleges that scientific evidence available before the May 2007 recall gives rise to an inference of scienter by showing: (1) a significant increase in incidents of AK after the reformulation of Complete in 2002; and (2) Complete was ineffective in protecting customers from AK and that AMO was or should have been aware of this problem.

Plaintiff points to three pieces of evidence to support the notion that the incidence of AK increased after Complete's reformulation. First, clinicians at the Department of Ophthalmology at the University of Illinois at Chicago diagnosed forty cases of AK between June of 2003 and November of 2005. (Compl. ¶ 41; Zelichov Decl. Ex. 34.) This amount was seven times greater than the number of cases diagnosed between June of 2000 and November of 2002. (Compl. ¶ 41.) Second, ophthalmologists at the Wills Eye Hospital in Philadelphia, Pennsylvania reported that they diagnosed nineteen cases of AK between January of 2004 and August of 2005. (Compl. ¶ 42; Zelichov Decl. Ex. 33.) This amount was an increase from the eleven cases they had

diagnosed between 1999 and 2003. (Compl. ¶ 42.) Third, physicians at the Massachusetts Eye and Ear Infirmary ("MEEI") announced that MEEI performed four therapeutic transplants for "recalcitrant" AK in 2006. (Compl. ¶ 43; Zelichov Decl. Ex. 35.) MEEI had performed one or two transplants in previous years. (Compl. ¶ 43.)

Plaintiff also cites three scientific studies to support the contention that Complete's ineffectiveness in withstanding AK was well-documented. First, Plaintiff cites a 2003 study entitled *Determination of Amoebicidal Activities of Multipurpose Contact Lens Solutions by Using a Most Probable Number Enumeration Technique*, in which researchers tested six multi-purpose contact lens solutions for their efficacy against *Acanthamoeba castellani* trophozites and cysts. (Compl. ¶ 44; Zelichov Decl. Ex. 29.) These researchers found that Complete "failed to have any impact" on the trophozoites and cysts after AMO's minimum recommended disinfection time. (Compl. ¶ 44.) Second, Plaintiff cites a 2005 study, *Efficacy of Multipurpose Solutions Against Acanthamoeba Species*, which concluded that while all of the multi-purpose solutions tested were effective at reducing the number of viable *Acanthamoeba* species, Complete was less effective than the others. (Compl. ¶ 45; Zelichov Decl. Ex. 31.) Finally, Plaintiff cites *Variable Responses of Acanthamoeba Strains to Three Multipurpose Lens Cleaning Solutions*, a 2007 study concluding that Complete was "relatively ineffective" and "the least effective solution tested" in killing strains of AK. (Compl. ¶ 46; Zelichov Decl. Ex. 37.)

Like the adverse effect reports, these scientific studies do not give rise to a strong inference of scienter.

As to the three reports by ophthalmologists indicating an increased incidence of AK, Plaintiff has not alleged information suggesting that AMO knew or should have known that the increased incidence of AK was due to a problem with Complete. Plaintiff only contends that "AMO's formulation changes for Complete in late 2002 paralleled the onset of AK outbreaks." (Compl. ¶ 43.) Without more, the Court cannot infer how the increased incidence of AK should have put Defendants on notice that something was wrong with Complete. Moreover, Plaintiff's contention that the formula change caused the "outbreak" of AK ignores a factor these reports indicate is associated with the increased incidence of AK – the use of contact lenses. (*See* Compl. ¶ 41

(stating in reference to the study by the ophthalmologists at the University of Illinois at Chicago that in out of the forty cases of AK diagnosed, 95% of the patients wore contact lenses).) Without data indicating that the number of people using contact lenses remained constant over the years cited by the studies, it is difficult to assess whether the increased incidence of AK is due to the formula change in Complete, or whether it is due to a factor such as the increased use of contact lenses.

The studies offered in support of Plaintiff's contention that Complete's ineffectiveness in withstanding AK was well-documented are similarly unpersuasive. The July 2003 study indicated that Complete "failed to have any impact" on AK trophozites and cysts after AMO's minimum recommended disinfection time of four hours. (Compl. ¶ 44; Zelichov Decl. Ex. 29, at 233.) However, the study also indicated that after twenty-four hours Complete killed 99.9% the trophozites and was just as effective as the other solutions tested at killing cysts. (Zelichov Decl. Ex. 29 at 234.) These mixed results would not have provided Defendants much basis to believe that there was a problem with Complete, or at least Defendants would have been reasonable to wait and see if further research clarified the results of the 2003 study. *See Oran v. Stafford*, 226 F.3d 275, 284 (3d Cir. 2000) (holding that a pharmaceutical company's failure to disclose data regarding adverse effects was not misleading where the link between the company's drugs and their purported side effect "was never definitively established"); *In re Carter-Wallace*, 220 F.3d at 42 ("[E]arly medical reports may have indicated a potential problem, but until a connection between [the drug] and any illness could be made, we would not expect [defendant] to abandon its product on what, at the time, would have been speculation.").

Furthermore, while the 2005 and 2007 studies found that Complete was less effective at fighting strains of AK than the other solutions tested, these results were only relative. That Complete was less effective than the other solutions at fighting AK does not necessarily indicate that Complete is not effective at all, or even that it is not effective enough, and neither study stated a finding to the contrary. (*See* Zelichov Decl. Ex. 31, at 249-50; Zelichov Decl. Ex. 37, at 288-90.) Based on the finding of the relative ineffectiveness of Complete, Defendants did have some cause to be concerned about the efficacy of the product in fighting AK. However, these facts are far from

1    the type of facts that would give rise to a strong inference that Defendants acted with intent or

2    deliberate recklessness. *Cf. In re Amgen Inc. Sec. Litig.*, No. 07-2536, 2008 WL 999058, at *13

3    (C.D. Cal. Feb. 1, 2008) (holding that plaintiffs had alleged facts sufficient to meet the heightened

4    standard for pleading scienter under the PSLRA where two "well-designed clinical trials" showed

5    "substantial safety concerns" regarding defendant's product and where the FDA had indicated to

6    defendants that these safety concerns be resolved with further clinical study).

7                          iv.    Taken Together, Plaintiff's Allegations Do Not Give Rise to a

8                                 Strong Inference of Scienter.

9          While the above allegations, as a whole, raise at best a slight inference of scienter, most

10   strongly in the case of Defendant Heidrich, opposing inferences caution against such a finding.

11   Defendants initiated the May 2007 recall the same day they received data from the CDC regarding

12   the association between Complete and AK, and before either the CDC or the FDA required them

13   to do so, suggesting that the company was motivated to proceed responsibly by withdrawing

14   Complete from the market upon receipt of reliable information demonstrating a problem with the

15   product. The Court concludes that, on the current record, Plaintiff has failed to raise a strong

16   inference of scienter. Plaintiff's claim for a violation of § 10(b) and SEC Rule 10b-5 is thus

17   DISMISSED on this ground as well, with leave to amend to the extent that Plaintiff alleges new

18   misleading statements.

19                          c.    Reliance

20         Plaintiff relies on the "fraud-on-the-market" theory to plead the reliance element of his

21   securities fraud claim. He argues that he suffered economic damage because "[i]n reliance on the

22   integrity of the market, [he] paid artificially inflated prices for AMO securities." (Compl. ¶ 97.) Under

23   the fraud-on-the-market theory, a plaintiff is not required to plead that he relied on any particular

24   misrepresentation or omission by the defendant to establish liability under § 10(b). *Provenz v.

25   Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996). Rather, a plaintiff can successfully plead reliance

26   simply "by show[ing] that [he] relied on the integrity of the price of the stock as established by the

27   market, which in turn is influenced by information or the lack of it." *In re Convergent Tech. Sec.

28   Litig.*, 948 F.2d 507, 512 n. 2 (9th Cir. 1991) (internal citation omitted). However, "[i]n a fraud on

19

1  the market case 'an omission is misleading only if the information has not already entered the

2  market.'" *Provenz*, 102 F.3d at 1492 (citing *In re Convergent Tech.*, 948 F.2d at 513).  If the

3  market has already become aware of the information, the fraud on the market theory fails. *Id.*

4       Defendants argue that Plaintiff's fraud on the market theory fails because the market was

5  already aware of the information that Plaintiff alleges Defendants failed to disclose. (Mot. 14.)

6  However, "the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a

7  complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 2008 WL 999058, at *9. Thus, insofar as

8  Plaintiff successfully amends the Complaint, dismissal on this basis is improper.

9       2.   Plaintiff's § 20(a) Claim

10       Plaintiff also brings a claim under § 20(a) of the Securities Exchange Act. Section 20(a)

11  provides joint and several liability for "controlling persons" who aide or abet violations of other

12  sections of the Exchange Act. The relevant statute states in part: "Every person who, directly or

13  indirectly, controls any person liable under any provision of this chapter or any rule of regulation

14  thereunder shall also be liable jointly and severally with and to the same extent as the controlled

15  person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a). To

16  establish a claim under § 20(a), a plaintiff must show: (1) "a primary violation of federal securities

17  law"; and (2) "that the defendant exercised actual power or control over the primary violator."

18  *Howard*, 228 F.3d at 1065. Defendants move to dismiss Plaintiff's § 20(a) claim on the grounds

19  that Plaintiff has failed to state facts sufficient to establish either condition.

20       For the reasons stated above, Plaintiff has not shown a primary violation of §10(b) and SEC

21  Rule 10b-5. Thus, Plaintiff has not met the first requirement of a § 20(a) claim. That said,

22  assuming that Plaintiff amends the Complaint to allege a securities law violation, the Court finds

23  that Plaintiff has alleged sufficient facts to satisfy the second requirement of a § 20(a) claim.[9]

24  _____

25      [9] Plaintiff alleges that each of the individually named defendants were involved in the "day-
to-day" control of the company and that all of the Defendants sit on the Board of Directors for AMO

26  or work for the company in an executive capacity. (Compl. ¶¶ 18-22.) Plaintiff also alleges that
Defendants Mazzo, Meier, and Heidrich are shareholders in the company. (Compl. ¶¶ 18-22.)

27  These "indicia of control" establish a prima facie showing that the named Defendants were
"controlling persons" under § 20(a) and that the second requirement of the "control person" claim

28  has been adequately stated. *See No. 84 Employer-Teamster*, 320 F.3d at 945-46 (finding "indicia

B.     Motion to Dismiss for Lack of Personal Jurisdiction

Defendants move to dismiss Plaintiff's claims against Defendant Heidrich, contending that Plaintiff has failed to allege facts sufficient to establish this Court's personal jurisdiction over Heidrich. Defendants argue that Heidrich is a foreign defendant who lives and works in Germany and that "[i]n order to establish personal jurisdiction over a foreign defendant in a securities fraud case . . . a plaintiff must allege that the defendant actually made a false or misleading statement." (Mot. 24.) Because, in Defendants' view, Plaintiff has not alleged that Heidrich actually made any false or misleading statements, personal jurisdiction over Heidrich has not been established. However, Defendants cite no supporting authority for this argument, and the Court find this conclusion to be contrary to Ninth Circuit case law and the Securities Exchange Act.

The governing statute is 15 U.S.C. § 78aa, which states in relevant part: "Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . . ." Under this statute, a securities fraud action may be brought against a defendant in any district wherein the defendant "transacts business," so long as "the defendant has minimum contacts with the United States." *Bourassa v. Desrochers*, 938 F.2d 1056, 1057-58 (9th Cir. 1991).

Plaintiff's allegations against Heidrich meet this standard. Plaintiff alleges that Defendant Heidrich trades in the United States securities markets, purposefully availing himself of the protections and privileges of the United States, and that Heidrich has conducted business with AMO's executive offices in Santa Ana, California. (Opp'n 24.) Defendants do not dispute these allegations. Thus, on these allegations alone, Plaintiff has alleged one basis for personal jurisdiction over Defendant Heidrich.

Additionally, Plaintiff has alleged that Heidrich was personally involved in creating and

of control" establishing a control person claim where defendants were shareholders in the company and had power to elect the members of the Board of Directors); *cf. Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) (holding that a lender was not a "controlling person" where the lender did not have a shareholder relationship with the target company and did not sit on the Board of Directors).

disseminating the allegedly misleading statements, and that he was responsible for "a significant degree of day-to-day control over [AMO]." (Compl. ¶ 20.) These allegations provide a second, basis for personal jurisdiction. *See San Mateo County Transit Dist. v. Dearman, Fitzgerald, & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992) (holding that personal jurisdiction exists in a case arising under the Securities and Exchange Act so long as "the plaintiff makes a non-frivolous allegation that the defendant controlled a person liable for fraud") Thus, the Court finds that Plaintiff has alleged facts sufficient to establish personal jurisdiction over Defendant Heidrich. Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction is DENIED.

III.   <u>RULING</u>

For the above reasons, the Court GRANTS Defendants' Motion; the Complaint is DISMISSED without prejudice. To the extent that Plaintiff amends, Plaintiff must allege new statements. Plaintiff must file an Amended Complaint **on or before July 7, 2008**. Defendants must answer or otherwise respond **on or before July 28, 2008**.

IT IS SO ORDERED.

Dated this 6th day of June, 2008.

/ S /
_____
S. JAMES OTERO
UNITED STATES DISTRICT JUDGE